# IN THE SUPREME COURT OF IOWA

No. 19 / 04-0855

Filed April 7, 2006

**STATE OF IOWA,**

Appellee,

vs.

**DIXIE LYNN SHANAHAN,**

Appellant.

---

Appeal from the Iowa District Court for Shelby County, Charles L. Smith III, Judge.

The defendant appeals from her conviction for second-degree murder. **AFFIRMED.**

Linda Del Gallo, State Appellate Defender, and Stephan J. Japuntich, Assistant State Appellant Defender, for appellant.

Thomas J. Miller, Attorney General, Mary E. Tabor and Charles N. Thoman, Assistant Attorneys General, for appellee.

**WIGGINS, Justice.**

A jury convicted Dixie Shanahan of second-degree murder for killing her husband. Dixie claims the trial court erred in overruling her motion to suppress and her motions for judgment of acquittal and for new trial. She also asserts her trial counsel was ineffective. Although we find no basis to reverse her conviction, we preserve some of Dixie's claims of ineffective assistance of counsel for postconviction relief. Accordingly, we affirm the judgment of the district court.

## I. Background Facts and Proceedings.

Dixie and Scott Shanahan were married in 1995, and they lived in Defiance, Iowa in a house Scott inherited from his parents. Scott did not work. Dixie worked at various jobs. They had two children during Scott's lifetime, Zachary and Ashley. A third child, Brittany, was born after Scott's death.

Dixie and Scott's relationship was characterized by both physical and mental abuse. Dixie testified Scott "could flip on a nickel," threatened her life, and often threatened to take their children away from her. There were many instances of abuse, which Dixie often attempted to cover up. Three of the incidents led to the prosecution of Scott for domestic abuse.

On July 21, 2003, the Shelby County sheriff's office received a call from a concerned citizen who advised law enforcement that Scott had not been seen in or around Defiance for a considerable amount of time, which the caller considered out of the ordinary. Sheriff Gene Cavenaugh first tried to locate Scott in Atlantic, Iowa because the officers had heard he might be there. Cavenaugh was unable to do so.

Deputy John Kelly visited Dixie the following day. They talked on the sidewalk outside her residence. Dixie told Kelly that Scott had left their

residence in August 2002 and she did not know where he was, but she thought he might be living in Atlantic. She stated she had not seen Scott since that time, but said he called her around February 2003 in regards to the birth of their third child. She also told Kelly she believed Scott made hang-up calls to her residence periodically. Dixie stated her sister in Texas was making the house payments along with the insurance and tax payments. She also denied selling Scott's tools but acknowledged she was involved in a romantic relationship with Jeffrey Duty of Ida Grove, Iowa.

On July 23, 2003, Dixie went to the sheriff's office and spoke to Cavenaugh, wanting to know why the sheriff's office was checking on Scott. She also asked if she was being accused of doing something to Scott, which Cavenaugh denied. At that time, she gave Cavenaugh the name of an individual who claimed to have seen Scott in Harlan, Iowa in April 2003.

The next day, Cavenaugh and Dixie spoke in the driveway of her residence. She told Cavenaugh that Scott left in August 2002 after he became angry with her over her pregnancy. She also told Cavenaugh before Scott left, he beat her up when she refused to have an abortion. She further stated she was not home when Scott left but he took his clothes, some other possessions, and withdrew all of the funds he had in some mutual funds. She also stated he did not take a vehicle with him.

On October 17, 2003, law enforcement officers from the Shelby County sheriff's office and the Iowa division of criminal investigation made an application for a search warrant to search Scott and Dixie's residence, property, and vehicles for any blood, bodily fluids, hair, fibers, or DNA samples of Scott, as well as any computer hardware, printers, dangerous weapons, or Scott's body or body parts. The application stated such items were used or possessed with the intent to be used as the means of

committing a public offense or concealed to prevent an offense from being discovered, and were relevant and material as evidence in a criminal prosecution.

The affidavit in support of the application for the search warrant, made by the same law enforcement officers, recited most of the above facts, stated the Defiance post office did not have a forwarding address for Scott and Dixie picks up his mail, listed Cavenaugh's contacts with Scott's friends and relatives, and set forth the law enforcement officers' various attempts to locate Scott. The affidavit included a statement from one of Scott's friends stating he heard from a meter reader in Defiance that a bedroom window was open in the Shanahan house all of the previous winter. The affidavit also stated Scott's mutual fund account was depleted in August 2002 and numerous insufficient-funds checks were drawn on it in August and September 2002 bearing Scott's signature, although a note attached to the file indicated the checks may have been signed by Dixie.

The affidavit further stated Dixie had sold one of Scott's vehicles and perhaps the contents of his shop building. It detailed how Scott's bank account was frequently overdrawn in the summer of 2002 but had been inactive for nearly a year. The affidavit also stated Dixie was receiving public assistance based on an application she filed on September 11, 2002. In addition, the affidavit referred to the bank's mortgage records, which included an October 2002 letter supposedly signed by Scott requesting the bank to add Dixie's name to the account. Finally, the affidavit confirmed Dixie sold Scott's tractor and told the buyer Scott would never be back.

In the affidavit, the applicants stated the above facts indicated Scott "likely met with some type of foul play" at his home, concluding there was probable cause that a crime had been committed and that evidence of that

crime would be found in the places requested to be searched. In addition, as part of the application for the search warrant, there were seven informant's attachments and other documentation related to the investigation.

A magistrate issued the search warrant, and law enforcement officers executed the warrant. The officers who processed the residence found the northeast bedroom of Dixie's residence blocked off with various items in the hallway. A rolled-up towel was placed at the base of the bedroom door alongside two air fresheners. In the bedroom, the officers found human remains on the bed, under the covers, in the position of lying on the right side and stomach area. The body was clothed only in briefs and a television remote control was at the end of the left foot. The body had its head on a pillow, with a second pillow placed between its legs, and a third pillow tucked within its left arm. An officer at the crime scene described this position as "typical of someone . . . lying in bed, resting or sleeping, just lying on your side, with your head on a pillow and a pillow between your legs and one under your left arm."

The remains were later identified as the body of Scott. Although the body was markedly decomposed, partially skeletonized, and partially mummified, it was determined he died from a shotgun wound to the back of the head. The officers did not find the shotgun that killed Scott during the search of the residence, but located it later in the children's bedroom closet.

During the search, Dixie was at the home of Kathy Meyers. Meyers testified Dixie became hysterical and admitted to shooting Scott. Meyers stated Dixie said "she didn't know if it was right or wrong but she just couldn't take it no more" and couldn't justify what she did. Meyers stated

Dixie hid from the officers but was eventually arrested, and Dixie had told her "she wanted [Scott] out for fear of Brittany's life."

At trial, Dixie explained her relationship with Scott at the end of August 2002 was "[v]ery, very rocky" and she was being "[v]ery badly" abused by him three to four times a week. She said when she found out she was pregnant with Brittany, Scott "went ballistic" and told her to have an abortion. She refused. She testified they fought for several days, with Scott beating Dixie. During the beatings, Scott would tell her he would make sure she would not have the baby and there was nothing she could do about it.

She went on to testify that on August 30, 2002, Dixie woke up around 6:30 a.m. and woke her children. She sent Zachary to school before Scott awoke. When Scott woke up, he became enraged because Dixie did not wake him before Zachary left. She stated he then pulled Dixie by the hair and beat her in the stomach, hollering he was going to kill the unborn baby one way or another. At this point, Dixie sent Ashley to a friend's house nearby. Dixie testified as she tried to leave, Scott followed her, took the car keys from her, and prevented her from leaving. He then knocked her on the ground, dragged her by her hair back into the house, and punched her in the stomach saying, "I'm gonna kill this baby. You're not having this baby."

Dixie said while she laid there crying, Scott went into the other room and came back with the shotgun. She said he was in a rage, physically shaking, and calling her names. He put two different shells in the gun and pointed the gun at her. He threatened her by saying, "This day is not over yet. I will kill you." He then walked away. As she sat in the living room chair, he came back in a rage and beat her again, threatening her and the unborn baby's lives.

Scott took all of the telephones out of the telephone jacks except the one in the bedroom. He took the telephones with him into the bedroom, where he laid down. Dixie thought the telephone in the bedroom was still working. Despite being dressed and sitting in a chair right by the door with nobody around, Dixie decided to call the police instead of leaving the house. She went into the bedroom to get the telephone. She said Scott was awake lying in bed on his side. As Dixie entered the bedroom to get the telephone, she saw Scott make a movement at her or the gun sitting beside the telephone. Dixie said she saw the gun, grabbed it, pointed it at Scott, closed her eyes, and shot him in the back of the head. She claimed she needed to protect herself and did not have any other choice but to fire the gun.

Dixie said she set the gun down, walked out of the bedroom, and sat in a chair for a couple of hours. She described herself as "[v]ery upset," thinking about what she did and what she was going to do. Still unsure about what she was going to do, Dixie went back into the bedroom, pulled up the sheets to cover the body, retrieved the telephone and the gun, shut the bedroom door, and put a towel underneath it. She put the gun in the children's bedroom closet.

Dixie never did anything else with Scott's body and never told anyone what happened. She and her children continued to live in the house trying to live a normal life. She told people lies about Scott so she could avoid going to jail. She said she went into the bedroom three times after the shooting, all in the same day. She said at the time of the shooting the windows were open in the house, but she was able to close the bedroom window from the outside.

The day of the shooting, Dixie drove to a store and signed a check in Scott's name. The check was drawn on the mutual fund account. She wrote checks bearing Scott's signature from that account totaling $1942 after he died. When the mutual fund dishonored the checks, the stores sent letters to Scott at the Defiance residence. Dixie replied to these letters blaming Scott for the problem.

Dixie also wrote a letter to the mortgage company, again signing Scott's name, so she could have her name added on the account to deal with the late mortgage payments. In addition, Dixie sold Scott's property netting about $10,400. She sent the money to her sister in Texas to hold for her house payments and to avoid reporting the money as an asset to the public assistance authorities.

On October 30, 2003, the State charged Dixie with murder in the first degree in violation of Iowa Code sections 707.1 and 707.2 (2001), stating she "did willfully, deliberately, and with premeditation and malice aforethought kill another person." The State amended the trial information to add the use of a firearm in the commission of the offense. Dixie entered a plea of not guilty.

Prior to trial, Dixie filed a motion to suppress claiming the application for the search warrant, the affidavit in support of the application for the search warrant, and the search warrant itself were all without probable cause. The court denied Dixie's motion.

Dixie filed a notice of defense, stating she intended to introduce evidence of justification by defense of self and others at trial. The case proceeded to a jury trial. Dixie's trial counsel moved for a judgment of acquittal stating the State did not present a prima facie case as to murder in the first or second degree. Her counsel claimed there was no evidence of

malice or evidence showing her actions were not justified. The court overruled the motion.

At this point in the proceedings, Dixie acknowledged she rejected the State's offer to allow her to plead guilty to voluntary manslaughter. She acknowledged she was aware of the possible sentencing ramifications at the time she turned down the plea agreement. Prior to final arguments, the court sustained the State's motion in limine prohibiting Dixie's trial counsel from arguing she acted in defense of Zachary or Ashley.

The jury found Dixie guilty of the lesser included offense of murder in the second degree and that she was in the immediate possession and control of a firearm at the time of the offense. Dixie filed a motion for new trial. The court overruled the motion. On the same day, the court sentenced Dixie to an indeterminate fifty-year term of imprisonment, required her to serve a minimum of thirty-five years, and ordered her to pay $150,000 in restitution to Scott's estate. Dixie appealed. We will set out additional facts as they relate to the issues.

## II. Issues.

Dixie raises numerous issues on appeal. They include: (1) whether the district court erred in overruling Dixie's motion to suppress; (2) whether the district court erred in overruling Dixie's motions for judgment of acquittal and for new trial; and (3) whether Dixie's trial counsel provided her with ineffective assistance of counsel.

## III. Motion to Suppress.

Dixie claims the search warrant application did not contain information giving rise to probable cause that a crime was committed on the premises or that evidence of a crime could be located there. She alleges innocent-appearing activity alone will not support a finding of probable

cause. She says the only reason the authorities gave for the search warrant was Scott's disappearance from the community and the speculation in the affidavit is not enough to supply the necessary nexus between the place to be searched and items sought. She claims this is a violation of her rights as guaranteed by the Fourth Amendment to the United States Constitution. She makes no claim on appeal under the Iowa Constitution.

When assessing an alleged violation of a constitutional right, our review is de novo. *State v. Freeman*, 705 N.W.2d 293, 297 (Iowa 2005). We independently evaluate the totality of the circumstances. *State v. Turner,* 630 N.W.2d 601, 606 (Iowa 2001). The fact findings of the district court are not binding; however, because the district court had the opportunity to assess the credibility of the witnesses, we do give deference to those findings. *Id.*

The Fourth Amendment to the United States Constitution assures "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. The Fourth Amendment is binding on the states through the Fourteenth Amendment of the federal constitution. *Freeman*, 705 N.W.2d at 297. The Fourth Amendment requires probable cause to support a search warrant. *State v. Gogg*, 561 N.W.2d 360, 363 (Iowa 1997).

The test to determine whether probable cause exists to issue a search warrant is:

> "whether a person of reasonable prudence would believe a crime was committed on the premises to be searched or evidence of a crime could be located there." Probable cause to search requires a probability determination that "(1) the items sought are connected to criminal activity and (2) the items sought will be found in the place to be searched."

*Id.* (citations omitted). We do not attempt to independently determine probable cause but rather "merely decide whether the issuing judge had a substantial basis for concluding probable cause existed." *Id.* Our determination of a substantial basis is " 'limited to consideration of only that information, reduced to writing, which was actually presented to the [judge] at the time the application for warrant was made.' " *Id.* (alteration in original) (citations omitted).

In determining if evidence seized pursuant to a warrant should be suppressed, "the affidavit of probable cause is interpreted in a common sense, rather than a hypertechnical, manner." *Id.* at 363-64. Additionally, "we draw all reasonable inferences to support the judge's finding of probable cause . . . and give great deference to the judge's finding." *Id.* at 364. "Close cases are decided in favor of upholding the validity of the warrant," and "[i]f a warrant is held to permit places to be searched or items to be seized for which probable cause is lacking, the warrant is nevertheless valid for those places and items described for which probable cause exists." *Id.*

The law enforcement officers submitted an eight-page affidavit to support their application for a search warrant. In addition to including the statements made by Dixie, the affidavit stated the authorities launched a nationwide search for Scott after they discovered Scott left no forwarding address. First, they started with Scott's friends and relatives. These people stated they had not seen Scott for a long time. The authorities also checked the Iowa Job Service files and with the Social Security Administration. Both agencies reported no activity by Scott in the last year. They also checked all fifty states' driving license records. They found no state had issued a license to Scott other than the one previously issued by Iowa. Finally, they entered Scott's name as a missing person in the National Crime Information

Center (NCIC), a nationwide computer database. The database automatically cross-checks missing persons with unidentified dead files on a nightly basis and sends a message to the entering agency if it finds a match. The authorities never received any messages as a result of their entry.

The affidavit also indicated the authorities checked on Dixie's statements. They learned she sold Scott's tractor telling the purchaser Scott would never be back. They also made inquires with the Cass County chief deputy because Dixie said she thought Scott might have moved to Atlantic. The Cass County chief deputy and the Atlantic police chief checked their information sources and found nothing to indicate Scott was living in Atlantic. The authorities also subpoenaed the mutual fund account records and checked the file containing the checks allegedly written by Scott after he disappeared. The file contained a notation stating that even though the checks bear Scott's signature, Dixie might have signed them. In checking the motor vehicle registration records, the authorities determined Dixie sold Scott's vehicle to a person who registered it in Pottawattamie County.

The authorities also subpoenaed the records of the Iowa department of human services. Dixie's application for public assistance stated she and Scott were separated and she only had six hundred dollars available to her. Dixie's financial disclosure to the department was inconsistent with the record of payments made on her mortgage.

Finally, the affidavit discussed the long history of domestic violence in Scott and Dixie's home, including Scott's possessive personality. The affidavit also noted Dixie's new romantic relationship. It stated it would be out of character for an abuser such as Scott to leave his wife, children, and

possessions in light of his possessive personality. It also mentioned it would be unusual for Dixie to start a new romantic relationship without any concern or fear Scott would find out and physically harm her.

In a case remarkably similar to this case, we affirmed the issuance of a search warrant to search the defendant's residence to seek evidence regarding the disappearance of the defendant's former girlfriend. *State v. Green*, 540 N.W.2d 649, 656 (Iowa 1995). There the State charged the defendant with murder after a search of his residence resulted in finding the body of his former girlfriend, which had been under the basement stairs for seven months. *Id.* at 652-53. We found the magistrate was justified in finding probable cause stating:

> Several factors suggest that [the victim Rosemary] McGivney's disappearance was not voluntary. For example, had McGivney left Mason City of her own accord, it is reasonable to believe she would have needed money and a means of transportation, yet she left her car and SSI checks behind. Given the fact that Rosemary normally kept in touch with her mother on a regular basis, her complete lack of communication for at least three months bolsters the conclusion that her disappearance was not voluntary. Added to this mysterious disappearance is Green's history of domestic violence toward her. This knowledge, coupled with the fact that Rosemary was last seen at Green's house, adds support to the conclusion that some harm had come to her and that Green was involved. Finally, Green's extreme reaction to the request to search his house calls into question his explanation of Rosemary's disappearance. Although a refusal to submit to a search may not, standing alone, constitute probable cause to believe an offense has been committed . . . when added to the other facts in this case, it strengthens the probable cause finding.

*Id.* at 656 (citation omitted).

Turning to the facts of this case, we find the totality of the circumstances as presented in the search warrant application and the common-sense inferences that a reasonable person may draw from them result in the conclusion the issuing judge could reasonably have inferred

criminal activity caused Scott's disappearance, and the authorities would find evidence of this activity at Dixie's residence. Thus, there was a substantial basis for the issuing judge to conclude probable cause existed to issue the search warrant.

### IV. Motions for Judgment of Acquittal and for New Trial.

Dixie's trial counsel moved for a judgment of acquittal at trial on the grounds the State failed to prove malice and Dixie was not justified in shooting Scott. The district court overruled Dixie's motion. After the jury returned its verdict of murder in the second degree, Dixie raised this issue in her motion for new trial claiming the verdict was contrary to the weight of the evidence. The court also overruled the motion for new trial.

In order to convict Dixie of second-degree murder, the district court instructed the jury the State had to prove: (1) on or about August 2002, Dixie shot Scott; (2) Scott died as a result of being shot; (3) Dixie acted with malice aforethought; and (4) Dixie acted without justification. *See* Iowa Code § 707.3 (providing "[a] person commits murder in the second degree when the person commits murder which is not murder in the first degree"). The district court defined "malice" as:

> a state of mind which leads one to intentionally do a wrongful act to the injury of another out of actual hatred, or with an evil or unlawful purpose. It may be established by evidence of actual hatred, or by proof of a deliberate or fixed intent to do injury. It may be found from the acts and conduct of the defendant, and the means used in doing the wrongful and injurious act. Malice requires only such deliberation that would make a person appreciate and understand the nature of the act and its consequences, as distinguished from an act done in the heat of passion.

*See State v. Love*, 302 N.W.2d 115, 119 (Iowa 1981) (discussing the definition of "malice"), *overruled on other grounds by State v. Reeves*, 636 N.W.2d 22, 26 (Iowa 2001). The district court defined "malice aforethought"

as "a fixed purpose or design to do some physical harm to another which exists before the act is committed. It does not have to exist for any particular length of time." *See State v. Lee*, 494 N.W.2d 706, 707 (Iowa 1993) (discussing the definition of "malice aforethought").

Because Dixie raised justification as a defense, the State was required to prove she acted without justification. *State v. Lawler*, 571 N.W.2d 486, 489 (Iowa 1997). As to the defense of justification, the district court instructed the jury:

> A person is justified in using reasonable force if she reasonably believes the force is necessary to defend herself from any imminent use of unlawful force.
>
> If the State has proved any one of the following elements, the defendant was not justified:
>
> 1. The defendant started or continued the incident which resulted in injury.
>
> 2. An alternative course of action was available to the defendant.
>
> 3. The defendant did not believe she was in imminent danger of death or injury and the use of force was not necessary to save her.
>
> 4. The defendant did not have reasonable grounds for the belief.
>
> 5. The force used by the defendant was unreasonable.

*See State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993) (setting forth the elements the State must prove to show a defendant's act was not justified). Dixie does not claim the law in the instructions was incorrect, but rather the evidence did not support the jury's finding as to malice and justification. Therefore, we will examine Dixie's claims in light of the instructions the district court gave the jury.

In evaluating Dixie's claim that the district court should have granted her motion for judgment of acquittal, we apply a sufficiency-of-the-evidence test and view the evidence in the light most favorable to the State. *State v. Greene*, 592 N.W.2d 24, 29 (Iowa 1999). Substantial evidence is required to support the verdict. *State v. Robinson*, 288 N.W.2d 337, 338-40 (Iowa 1980). If the evidence could convince a rational trier of fact the defendant is guilty of the charged crime beyond a reasonable doubt, it is substantial. *Greene*, 592 N.W.2d at 29.

As to Dixie's claim in her motion for new trial that the verdict was contrary to the weight of the evidence, the trial court should grant the motion only if the jury's verdict is contrary to the weight of the evidence. *State v. Ellis*, 578 N.W.2d 655, 657-59 (Iowa 1998). We review a trial court's ruling on a motion for new trial for an abuse of discretion. *State v. Atley*, 564 N.W.2d 817, 821 (Iowa 1997). A verdict is contrary to the weight of the evidence where " 'a greater amount of credible evidence supports one side of an issue or cause than the other.' " *Ellis*, 578 N.W.2d at 658 (citation omitted).

Although Dixie testified she only picked up the shotgun after she saw Scott move towards her or the gun, there is other substantial and credible evidence to support her conviction. At trial, an officer described the position of Scott's body as found by the officers to be "typical of someone . . . lying in bed, resting or sleeping." Dixie admitted the position in which the authorities found Scott is "how he would sleep." The cause of Scott's death was determined to be a shotgun wound to the back of the head. *See State v. Hahn*, 259 N.W.2d 753, 759 (Iowa 1977) (stating a jury may infer malice aforethought from the use of a deadly weapon).

Additionally, Dixie's own statements supported the jury's finding in this case. In addition to the statements she made to Kathy Meyers, she told a fellow inmate while awaiting trial that she shot her husband in the back of the head while he was in the bed. During her cross-examination, Dixie told the jury she pulled the trigger hoping and meaning the gun would go off. When asked if she meant for the gun to go off so it would hit Scott in the head and kill him, she acknowledged that she not only meant to shoot him in the head, but she also meant to kill him. This evidence supports the State's contention that Dixie entered the room, saw Scott sleeping, took the shotgun, and shot him in his sleep.

Under the sufficiency-of-the-evidence test, this evidence could convince a rational trier of fact beyond a reasonable doubt that Dixie acted with malice and without justification when she shot Scott. The jury members were free to give Dixie's testimony such weight as they thought it should receive. *State v. Schrier*, 300 N.W.2d 305, 309 (Iowa 1981). They were free to accept or reject any of Dixie's testimony. *Thornton*, 498 N.W.2d at 673. The function of the jury is to weigh the evidence and "place credibility where it belongs." *State v. Blair*, 347 N.W.2d 416, 420 (Iowa 1984). Therefore, the district court was correct in overruling Dixie's motion for judgment of acquittal.

Additionally, the district court has considerable discretion when determining a motion for new trial under the weight-of-the-evidence test. *Ellis*, 578 N.W.2d at 659. Except in the extraordinary case where the evidence preponderates heavily against the verdict, trial courts should not lessen the jury's role as the primary trier of facts and invoke their power to grant a new trial. *Id.* A trial court should not disturb the jury's findings where the evidence they considered is nearly balanced or is such that

different minds could fairly arrive at different conclusions. *Reeves*, 670 N.W.2d at 203. For the same reasons we found there was sufficient evidence to overrule the motion for judgment of acquittal, we cannot say the evidence preponderates heavily against the jury's finding that Dixie acted with malice and without justification when she fired the shotgun. Therefore, the district court did not abuse its discretion when it overruled Dixie's motion for new trial.

**V. Ineffective-Assistance-of-Counsel Claims.**

Dixie raises numerous grounds in claiming her trial counsel provided ineffective assistance of counsel. She claims trial counsel was ineffective for: (1) failing to object to other-acts evidence; (2) failing to object to certain statements made by the prosecutor in the opening statement and closing arguments; (3) failing to object to the instruction telling the jury members it is their duty to determine "the defendant's guilt or innocence;" (4) failing to request a jury instruction regarding the defense of a third person, the third persons being her children and unborn child; (5) failing to make an adequate record regarding one of the State's rebuttal witnesses; (6) failing to adequately investigate the phenomenon known as "battered wives syndrome"; (7) failing to strike a domestic assault victim from the jury; and (8) failing to properly advise Dixie regarding the State's plea offer to plead to the crime of voluntary manslaughter.

Dixie's claims of ineffective assistance of counsel are derived from the Sixth Amendment of the United States Constitution. *Bowman v. State*, 710 N.W.2d 200, 203 (Iowa 2006). To prevail on her claims of ineffective assistance of counsel, she must prove: "(1) counsel failed to perform an essential duty and (2) prejudice resulted." *Id.* When " 'there is a reasonable probability that, but for the counsel's unprofessional errors, the result of

the proceeding would have been different,' " prejudice results. *State v. Hopkins*, 576 N.W.2d 374, 378 (Iowa 1998) (quoting *Strickland v. Washington*, 466 U.S. 668, 694, 104 S. Ct. 2052, 2068, 80 L. Ed. 2d 674, 698 (1984)).

We normally preserve an ineffective-assistance-of-counsel claim for a postconviction relief proceeding where preserving the claim allows the defendant to make a complete record of the claim, allows trial counsel an opportunity to explain his or her actions, and allows the trial court to rule on the claim. *State v. Bass*, 385 N.W.2d 243, 245 (Iowa 1986). We will not, however, preserve a defendant's ineffective-assistance-of-counsel claim and we will affirm the defendant's conviction on direct appeal if the appellate record shows as a matter of law the defendant cannot prevail on such a claim. *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003). Likewise, we will reverse a conviction based on an ineffective-assistance-of-counsel claim on direct appeal if the appellate record establishes both prongs of the *Strickland* test and a further evidentiary hearing would not change the result. *Id.* Accordingly, we will address Dixie's claims in this appeal where a sufficient record exists to permit a ruling and preserve those claims for postconviction relief where the record is insufficient.

*A. Failure of trial counsel to object to other-acts evidence.* The other-acts evidence comprising this claim by Dixie includes: (1) testimony regarding Scott's mutual fund account opened in 1994, which had balances up to $174,000, but was eventually drawn down to nothing; (2) the cross-examination of Dixie about the checks she wrote on this account by signing Scott's name after his demise; (3) a letter she sent to the mortgage company signing Scott's name asking the company to add her name to the account; and (4) Dixie's failure to disclose to the government the $10,400 she

received from the sale of Scott's property in order to obtain welfare payments she would not otherwise have been entitled to receive. There is a sufficient record to address this claim on direct appeal.

Dixie claims her trial counsel should have objected to the admissibility of this evidence, as it was irrelevant. The State argues the evidence is relevant under Iowa Rule of Evidence 5.404(*b*). This rule states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Iowa R. Evid. 5.404(*b*). The first step in deciding if other-acts evidence is admissible is to determine whether the other-acts evidence is relevant to some legitimate issue in the case for a reason other than to show the defendant's propensity to commit wrongful acts. *State v. Taylor*, 689 N.W.2d 116, 123-24 (Iowa 2004). Secondly, even if we determine the other-acts evidence is relevant, we must determine if the evidence's probative value is substantially outweighed by the danger of unfair prejudice to the person against whom the evidence is offered. *Id.* at 124. If the prejudicial value substantially outweighs its probative value, the other-acts evidence may be excluded. *Id.* at 123.

In the summer of 2002, a mutual fund account agent advised Dixie the balance of the mutual fund account was nearing zero. On the very day she shot Scott, Dixie drove to a store in Denison, Iowa and wrote a check on the account signing Scott's name. After Scott's death, she continued to sign Scott's name on checks totaling almost $2000. When the mutual fund began dishonoring these checks, Dixie received letters from the merchants. Dixie wrote letters to the merchants indicating Scott had moved to Atlantic.

After Scott's death, Dixie also wrote a letter to the mortgage company signing Scott's name asking the company to add her name to the mortgage account so she could attend to the loan payments. Finally, the evidence is undisputed that Dixie sold Scott's property. When she sold Scott's tractor, she told the buyer not to worry because Scott would not be back.

Even though this evidence may implicate Dixie in the crimes of forgery or theft, it is relevant to legitimate issues in this case to show Dixie took great pains to create the illusion Scott was still alive and had permanently left the area. Evidence showing a defendant's actions following commission of the alleged crime inconsistent with a claim of self-defense is probative of the defendant's lack of justification. *Cf. Thornton*, 498 N.W.2d at 673-74 (explaining a jury heard evidence the defendant "left the scene immediately after the shooting without stopping to call the police or an ambulance, or to explain to his friends present what had happened" and based on this and other evidence it "could rationally believe these were not the actions of someone who honestly believed he acted in self-defense"). Thus, this evidence is relevant to Dixie's justification defense.

Having determined this evidence is relevant, we must determine if the prejudicial value substantially outweighs its probative value. Evidence is unfairly prejudicial if it

> "appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [that] may cause a jury to base its decision on something other than the established propositions in the case."

*State v. Plaster*, 424 N.W.2d 226, 231 (Iowa 1988) (citation omitted). We balance the probative value and the prejudicial effect by considering the need for the evidence in light of the issues and the other available evidence, proof that the other acts were committed by the accused, the strength or

weakness of the other-acts evidence on the issue, and the degree to which the jury will decide the case on an improper basis. *State v. Rodriquez*, 636 N.W.2d 234, 240 (Iowa 2001).

Applying these factors, the record clearly establishes Dixie did these acts. In addition, we find the State needed the challenged evidence to present its case. Although Dixie admitted to shooting Scott, she claimed she was justified in doing so by reason of self-defense. This defense required the State to prove Dixie was without justification at the time she shot Scott. When a person is required to use deadly force to protect himself or herself, normally the first course of action is for that person to notify the authorities and report the incident. We believe Dixie's failure to contact the authorities after the incident coupled with her elaborate plan to create the illusion Scott was still alive, of which these acts are a part, is inconsistent with a person's claim of self-defense. Therefore, this evidence constitutes strong, essential evidence to refute Dixie's version of the circumstances surrounding the shooting.

We also think there is little risk the jury based its decision that Dixie was not justified in shooting Scott on the fact she may have been a thief or a forger. Although this evidence reflects badly on her character, it is an essential element in Dixie's plan to create the illusion Scott was still alive and is an important factor in explaining that Dixie was without justification when she shot Scott. Just because the other-acts evidence may have indicated Dixie was guilty of other crimes, that fact alone does not require us to find the prejudicial effect of those acts substantially outweighs their probative value. *See State v. Walters*, 426 N.W.2d 136, 140-41 (Iowa 1988) (finding evidence of the sexual abuse of a victim which occurred after the defendant kidnapped her was admissible "to show the complete story of the

crime," even though the evidence "may incidentally show commission of another crime").

Therefore, if Dixie's trial counsel had objected to the evidence regarding the mutual fund account, the checks drawn on the account, the letter Dixie sent to the mortgage company, and the sale of Scott's property, the trial court could properly have overruled those objections. Thus, trial counsel did not fail to perform an essential duty.

We, however, are not persuaded Dixie's secretion of $10,400 so she could receive welfare payments is relevant to a legitimate issue in this case. Without deciding the issue, but assuming trial counsel's objection to the testimony concerning the secretion of the $10,400 would have been sustained if made, we are convinced under the prejudice prong of the *Strickland* test that prejudice did not result from trial counsel's failure to object. This evidence was not much different in character from the other-acts evidence we concluded was admissible. The evidence of possible welfare fraud would not have had any more of a prejudicial effect on the jury than the admissible evidence constituting possible theft or forgery.

Furthermore, the State had a fairly strong case without this evidence. Dixie's elaborate scheme to create the illusion Scott was still alive together with the physical evidence causes us to believe there is no reasonable probability that the outcome of the case would have been different even if the court had not admitted the evidence of Dixie's alleged welfare fraud.

Consequently, we do not find Dixie's trial counsel was ineffective for failing to object to the other-acts evidence. *See State v. Liddell,* 672 N.W.2d 805, 809 (Iowa 2003) (recognizing the failure to prove either prong of the *Strickland* test is fatal to ineffective-assistance-of-counsel claims).

*B. Failure of trial counsel to object to certain statements made by the prosecutor in the opening statement and closing arguments.* Dixie complains her trial counsel was ineffective for failing to object to the prosecutor's repeated use of the personal pronoun "I" and to the prosecutor's use of personal opinions during his opening statement. A sufficient record exists to address this claim on direct appeal.

Our rules of criminal procedure govern the content of the prosecutor's opening statement. Iowa R. Crim. P. 2.19. The rules provide either the clerk or the prosecutor must read the charges to the jury and inform them of the defendant's plea to the charges. *Id.* r. 2.19(1)(*a*)(1). After the charges are read and the plea is disclosed to the jury, the prosecutor then "may briefly state the evidence by which the prosecuting attorney expects to sustain the [charges]." *Id.* r. 2.19(1)(*a*)(2). We have repeatedly condemned a prosecutor's conduct when the prosecutor asserts a personal opinion in the opening statement as to the outcome of the case, the credibility of a witness, or the guilt or innocence of the accused. *State v. Vickroy*, 205 N.W.2d 748, 749-50 (Iowa 1973).

In examining the claims made by Dixie, we do not think the prosecutor crossed the line in his opening statement. The prosecutor used the personal pronoun "I" in the context of what he believed the evidence would show to support the charges as filed. We also do not think the prosecutor injected his personal opinions into his opening statement as to the outcome of the case, the credibility of a witness, or the guilt or innocence of Dixie.

Dixie contends one of the more egregious statements made by the prosecutor in his opening statement was "I expect you'll find this from the evidence beyond a reasonable doubt" regarding the State's claim that Dixie

took a loaded shotgun, approached Scott while he was sleeping, and shot him in the back of the head killing him instantly. This so-called egregious statement is nothing more than the prosecutor's belief the evidence would support the charge of first-degree murder. The condemned statement does not indicate it was the prosecutor's personal belief that Dixie was guilty. *Cf. id.* at 749, 751 (holding a county attorney's conduct in his opening statement where he told the jury he knew the defendant was guilty constituted misconduct requiring reversal of the defendant's conviction and remand for a new trial). Because the statements made by the prosecutor in his opening statement were not subject to a sustainable objection, Dixie's trial counsel did not fail to perform an essential duty in failing to object to the prosecutor's opening statement.

Dixie also claims her trial counsel was ineffective for failing to object to certain portions of the prosecutor's closing arguments. Specifically, Dixie claims trial counsel should have objected to the prosecutor's statements: (1) vouching for the truth of the prosecutor's allegation that Dixie's counsel made material misstatements of fact and law in his opening statement; (2) accusing Dixie's counsel of creating evidence; (3) engaging in name-calling and disparagement of the defense; and (4) expressing a personal opinion as to the credibility of a witness and the guilt of the accused.

In making closing arguments, a prosecutor is entitled to some latitude when analyzing the evidence admitted during the trial. *State v. Phillips*, 226 N.W.2d 16, 19 (Iowa 1975). The prosecutor is allowed to draw conclusions and argue permissible inferences that may be reasonably derived from the evidence. *Thornton*, 498 N.W.2d at 676. The prosecutor cannot, however, assert a personal opinion or create evidence. *State v. Odem*, 322 N.W.2d 43,

47 (Iowa 1982). The prosecutor also cannot misstate the law. *Graves*, 668 N.W.2d at 880.

We have found new trials appropriate in light of various prosecutor conduct, including: (1) inflaming the fears, passions, and prejudice of the jury against the defendant by asking the members of the jury to place themselves or their families in a hypothetical position of danger similar to that created by the offense for which the defendant was charged, *Vickroy*, 205 N.W.2d at 751; (2) referring to the defense counsel's argument as a "smoke screen," *Graves*, 668 N.W.2d at 879, 884; (3) misstating the law by telling the jury members if they believe a witness's testimony they would have to find the defendant guilty, *Id.* at 880, 884; (4) vouching for the credibility of a witness against the credibility of the defendant, *Id.* at 879, 884; and (5) appealing to the passion and prejudice of the jury by holding up a baby book in front of the jury and stating due to the defendant's actions the baby book will never be completed while he tore pages from the book and dropped them on the floor, *State v. Werts*, 677 N.W.2d 734, 739-40 (Iowa 2004).

Our review of the record reveals Dixie's claims regarding the prosecutor's final arguments are unfounded. The prosecutor meticulously analyzed the evidence admitted and the law as instructed by the court in his final argument. On rebuttal, the prosecutor argued how defense counsel's interpretation of the evidence was inconsistent with the evidence. He made his arguments without calling the defense counsel names or disparaging the defense counsel's characterizations of the evidence. The prosecutor did not inject in his arguments his personal beliefs as to the credibility of a witness or as to the guilt of Dixie. The prosecutor skillfully

focused his arguments on the evidence admitted and the law as given by the court.

The statements of the prosecutor under attack by Dixie were within the range of a legitimate and appropriate comment on the evidence. Had Dixie's trial counsel objected to these portions of the prosecutor's closing arguments, the trial court should have overruled those objections.

Consequently, Dixie's claim of ineffective assistance of counsel must also fail on this issue. *See State v. Wills,* 696 N.W.2d 20, 24 (Iowa 2005) (finding trial counsel was not ineffective for failing to raise an issue with no merit).

*C. Failure of trial counsel to object to the instruction telling the jury members it is their duty to determine "the defendant's guilt or innocence."* A jury instruction given by the district court stated in relevant part, "You must determine the defendant's guilt or innocence from the evidence and the law in these instructions." Dixie claims such wording "change[s] the dynamics of the trial and effectively places an unconstitutional burden upon the defendant" to prove her innocence. She says her trial counsel was required to object to this instruction and his failure to do so was prejudicial. She further asserts this court's previous rejection of similar arguments is distinguishable because we have not addressed this issue in view of an affirmative defense. The record allows us to address this claim on direct appeal.

In evaluating a challenge to jury instructions, we consider the instructions as a whole and not separately. *State v. Fintel,* 689 N.W.2d 95, 104 (Iowa 2004). We have previously determined the use of the word "innocence" in jury instructions does not constitute ineffective assistance of

counsel for counsel's failure to object to the instructions where the other jury instructions adequately clarified the challenged instructions. *Id.*

In this case, the other instructions given to the jury provided the burden was on the State to prove the defendant guilty beyond a reasonable doubt, defined reasonable doubt, and stated the defendant was presumed innocent and not guilty unless the evidence established guilt beyond a reasonable doubt. We have previously found such instructions sufficient to clarify the wording contained in the challenged instruction. *Id.*; *see also State v. Tubbs,* 690 N.W.2d 911, 916 (Iowa 2005) (stating "[w]hen the instructions are considered as a whole, they make it clear that [the defendant] was presumed innocent and the State had the burden to prove guilt beyond a reasonable doubt"). Indeed, the challenged instruction goes on to state, "You must consider all of the instructions together. No one instruction includes all of the applicable law."

We do not believe Dixie's claim as to the instruction's lack of a basis in law comes into play here. *Cf. State v. Langlet,* 283 N.W.2d 330, 337 (Iowa 1979) (stating "[w]e do not believe a rational jury sitting in a criminal case would apply anything but the accepted legal meaning of the word ["innocent"] under the circumstances"). Furthermore, Dixie's assertion of the defense of justification does not change this analysis because the instructions expressly place the burden of proving that she did not act with justification on the State, rendering our prior rulings in this area just as applicable to the situation where a defendant raises justification as a defense. Thus, Dixie's trial counsel would not have succeeded if he had objected to the challenged jury instruction.

Accordingly, Dixie's ineffective-assistance-of-counsel claim as to this issue fails. *See Wills*, 696 N.W.2d at 24 (finding trial counsel was not ineffective for failing to raise an issue with no merit).

*D. Failure of trial counsel to request a jury instruction regarding the defense of a third person, the third persons being her children and unborn child.* Dixie argues her trial counsel erred in failing to request an instruction on defense of a third person in light of the evidence showing Dixie feared for the lives of Zachary and Ashley, as well as Brittany, who was unborn at the time of the shooting. She claims her trial counsel should have made an offer of proof or requested a curative instruction regarding the district court's granting of the State's motion to prohibit Dixie's trial counsel from arguing she acted in defense of Zachary or Ashley. She also claims she was entitled to a defense-of-third-person instruction as to her unborn child in view of Iowa's laws prohibiting feticide and Scott's egregious assaults on her. Dixie claims she was prejudiced because the jury may have found her guilty of a lesser-included offense or none at all had it been instructed on these justifications. We will address this claim on direct appeal.

The rules pertaining to jury instructions in civil cases also apply to the trial of a criminal case. Iowa R. Crim. P. 2.19(5)(*f*). Therefore, the court is required to "instruct the jury as to the law applicable to all material issues in the case." Iowa R. Civ. P. 1.924. A court should not submit an instruction on an issue for which there is not substantial evidence to support that issue. *Seaway Candy, Inc. v. Cedar Rapids YMCA*, 283 N.W.2d 315, 316 (Iowa 1979).

The Iowa Code provides:

> A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to

> defend oneself or another from any imminent use of unlawful
> force.

Iowa Code § 704.3. The legislature did not define the word "imminent" as used in this section of the Code. Therefore, "[w]e may refer to prior decisions of this court and others, similar statutes, dictionary definitions, and common usage" to determine its meaning. *State v. Kellogg*, 542 N.W.2d 514, 516 (Iowa 1996). The dictionary definitions of the word "imminent" are "ready to take place," "near at hand," "hanging threateningly over one's head," and "menacingly near." *Webster's Third New Int'l Dictionary* 1130 (2002).

Dixie testified at the time of the shooting she saw Scott make a movement towards her or the gun. She further testified in order to protect herself from serious injury or death, she grabbed the gun and shot Scott. At the time of the deadly confrontation between Dixie and Scott, Dixie knew neither Zachary nor Ashley were in the home. Zachary was at school and Ashley was at a friend's house. Thus, neither Zachary nor Ashley were in any danger from the imminent use of unlawful force. Accordingly, there was not substantial evidence to submit a defense-of-another instruction regarding Zachary or Ashley. Had Dixie's trial counsel pursued an instruction encompassing the defense of another for Zachary or Ashley, the trial court should not have given such an instruction.

Dixie also contends she was entitled to a defense-of-another instruction as to Brittany, who was unborn at the time of the confrontation. In deciding this issue, we believe the unique facts of this case do not require us to determine whether the legislature intended for an unborn child to fall within the definition of "another" under section 704.3.

At the time Dixie shot Scott, any threat of serious injury or death that Scott posed to her would also be posed to her unborn child. The trial court

submitted instructions on Dixie's claim of self-defense in view of her testimony that at the time of the final confrontation between her and Scott, she believed she needed to get to the gun before Scott did and shoot him in order to protect herself from serious injury or death. If the evidence in this case supported a finding that Dixie acted without justification to protect herself, it would also support a finding that she was without justification in the defense of her unborn child. Any threat of serious injury or death Dixie perceived to herself from Scott would constitute the same threat to her unborn child. Unfortunately for Dixie, the jury determined she acted without justification when she shot Scott. We are affirming that determination on appeal. Therefore, had the instruction of defense of another been given for the unborn child, we do not believe there is a reasonable probability that the outcome of the trial would have been different. Therefore, Dixie cannot establish any prejudice as a result of her trial counsel's failure to request an instruction based on the defense of her unborn child.

Accordingly, Dixie's ineffective-assistance-of-counsel claim on this issue must fail. *See Liddell,* 672 N.W.2d at 809 (recognizing the failure to prove either prong of the *Strickland* test is fatal to ineffective-assistance-of-counsel claims).

*E. Failure of trial counsel to make an adequate record regarding one of the State's rebuttal witnesses.* Dixie claims her trial counsel failed to make an adequate record regarding his discovery that a rebuttal witness for the State was the president of the local school board, and thus in a position of authority over at least six of the jurors either directly or through their spouses. The record does not establish the exact relationship between the rebuttal witness in question and the members of the jury. The record is

undeveloped as to any reasons why Dixie's trial counsel did not feel it was necessary to make a record on this issue or as to any prejudice which may or may not have resulted from trial counsel's actions. Therefore, because the record is insufficient to rule on this claim on direct appeal, we will preserve it for postconviction relief.

*F. Failure of trial counsel to adequately investigate the phenomenon known as "battered wives syndrome."* Dixie asserts her trial counsel breached his duty to make a reasonable investigation, or make a reasonable decision that an investigation was unnecessary, by failing to have Dixie examined by a mental health professional as recommended by the director of the Iowa Coalition Against Domestic Violence. Dixie claims the testimony of such a professional would have explained why she behaved in ways seemingly contradictory to her defense, as she believes she suffered from post-traumatic stress syndrome and battered wives syndrome. The record is devoid of any such recommendation, trial counsel's reasons for not obtaining an examination, and the results or benefits the trier of fact would have gleaned from such an examination. Therefore, we must also preserve this claim for postconviction relief.

*G. Failure of trial counsel to strike a domestic assault victim from the jury.* Dixie asserts she informed her trial counsel of a woman on the jury panel who had been a domestic abuse victim and requested her counsel to strike this juror from the panel. Dixie claims her trial counsel's failure to strike this juror violated her right to a fair and impartial jury. She also asserts her trial counsel's failure to strike this juror precluded her from exercising her right to aid in jury selection. Dixie, however, does not identify which juror she is referring to or inform us how she knows this fact about the juror. The record does not contain statements from Dixie's trial

counsel about this incident and how, if at all, counsel's failure to strike this juror prejudiced her case. These matters need to be developed at an evidentiary hearing; therefore, we will also preserve this claim for postconviction relief.

*H. Failure of trial counsel to properly advise Dixie regarding the State's plea offer to plead to the crime of voluntary manslaughter.* After the trial court overruled Dixie's motion for judgment of acquittal, the judge had an on-the-record discussion with Dixie and her trial counsel regarding the plea offer made by the State. In his colloquy with Dixie, the judge advised Dixie if the jury convicted her of second-degree murder, she would have to serve a mandatory minimum sentence of thirty-five years. Dixie acknowledged to the court that the State offered her a plea bargain to plead to the crime of voluntary manslaughter. The judge ensured Dixie was informed that voluntary manslaughter carries a ten-year sentence with the possibility of being out in two and one-half years.

After explaining the difference between the sentences for the two crimes, the judge asked Dixie whether it was her position not to accept the plea bargain. Dixie responded she did not want to accept the plea bargain. The judge then inquired as to whether Dixie made her decision in consultation with her attorney. Dixie replied that she did. The court made no further record.

On appeal, Dixie claims her trial counsel told her not to accept the plea offer because "there was no way a jury would convict her." Dixie asserts, based on the evidence at trial, "[t]o expect a jury not to convict of even voluntary manslaughter arguably rises to the level of placing undue reliance upon jury nullification of the law," and advising her based on such is a gross failure to exercise competence and diligence. In other words,

Dixie claims her trial counsel did not fully advise her on the desirability of the plea offer, the negative aspects of her case, and their impact on her justification defense.

The record does not contain trial counsel's version of what discussions he had with Dixie prior to her turning down the offered plea bargain. Without a fully developed record, we are unable to decide this claim on direct appeal. Therefore, we will also preserve this claim for postconviction relief.

### VI. Summary and Disposition.

We find no error in the district court's rulings with respect to the motion to suppress, motion for judgment of acquittal, and motion for new trial. We also find the appellate record sufficient to decide four of Dixie's claims of ineffective assistance of counsel and in doing so we find her trial counsel was not ineffective. However, we are unable to decide the other four claims of ineffective assistance of counsel and we preserve those claims for postconviction relief.

**AFFIRMED.**

All justices concur except Larson, J., who takes no part.