# IN THE COURT OF APPEALS OF IOWA

No. 21-0605
Filed June 7, 2023

**STATE OF IOWA,**
Plaintiff-Appellee,

**vs.**

**STANLEY PAUL WOFFORD,**
Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Scott Beattie, Judge.

Stanley Paul Wofford appeals his conviction for murder in the first degree.

**AFFIRMED.**

Martha J. Lucey, State Appellate Defender, and Maria Ruhtenberg, Assistant Appellate Defender, for appellant.

Brenna Bird, Attorney General, and Aaron Rogers, Assistant Attorney General, for appellee.

Heard by Bower, C.J., and Tabor and Greer, JJ.

**BOWER, Chief Judge.**

Stanley Wofford appeals his conviction for murder in the first degree. He asserts the State failed to prove he was not justified in the shooting death of John Belcher. We affirm his conviction.

**I. Background Facts & Proceedings.**

In March 2021, Wofford was tried for the murder in the first degree for Belcher's homicide. The following evidence was presented to the jury.

In August 2019, Wofford was a heroin dealer. Belcher, his supplier, would sometimes provide his dealers with heroin on credit; they would sell it to users at a mark-up and repay Belcher the costs. Belcher controlled the phones that lower-level dealers, like Wofford, used for selling his product.

In late August, Belcher fronted Wofford some heroin. Wofford tried to cut the heroin with other substances, spoiling the drugs and leaving him unable to repay Belcher. Belcher and Wofford were already on poor terms after Belcher's bike had gone missing from Wofford's house and, in response, Belcher took a dog from Wofford. Because Wofford was unable to repay him for the fronted drugs, Belcher turned off Wofford's phone and took those calls himself.

On August 31, Belcher was out with Danielle Smith, Brittly Hellems, and John James. Smith sold heroin for Belcher off and on, and James was intending to start selling for Belcher. At 2:13 p.m., Wofford called Belcher, after which

Belcher told the others they were going to Wofford's house to pick up some money.[1]  They arrived at Wofford's around 2:45 p.m.[2]

When Belcher's car arrived, Shull was sitting and smoking at a table in the driveway next to the side door of the house she shared with Wofford; her view of the street and front of the house was largely blocked by Wofford's SUV.  Shull testified she saw "what appeared to be Mr. Belcher walk past the back of the truck."  Smith testified she sat by Belcher's car smoking a cigarette, and Hellems and James stayed in the car.  Belcher went inside the house with Wofford, who had been waiting by the front door.

Smith heard arguing and then gunshots.  Smith testified she did not see Belcher with a gun that day, and did not know him to carry a gun.  She ran up to the house, and Wofford came out of the front door and told them to leave.  Smith testified she saw "smoke coming from behind him when he came outside."  Smith, Hellems, and James left around 2:47 p.m., driving to a hospital a block away.  Smith and Hellems got out of Belcher's car, while James drove to Wofford's house again before returning to the hospital.  James then got out of the car and walked away.  Smith ran back towards Wofford's house and noticed Wofford's vehicle was gone, then returned to the car.  Smith and Hellems drove Belcher's car to a gas station down the road.  While they were at the gas station, Hellems called 911 to

---

[1] Wofford called while driving home after picking up his girlfriend Melody Shull from work.

[2] The State presented time-stamped photos of Belcher's and Wofford's vehicles driving down Francis Avenue, obtained from security camera footage at houses on either side of Wofford's house.

report shots fired on Francis Avenue near Martin Luther King Jr. Parkway. Smith waved down a police car on the road to report the shooting.

Wofford testified he had been avoiding Belcher—dodging his calls and not wanting to see him. Yet, he called Belcher on August 31 and, when Belcher asked where he was, Wofford said he was on his way home.[3] Belcher replied he would be there shortly. According to Wofford, when Belcher arrived, James came in the house as well. When Wofford said he didn't have the money to pay him, Belcher got a gun from James and aimed it at Wofford. Wofford described a scuffle between himself and Belcher, and the gun falling to the couch. Wofford fell back and grabbed the gun before Belcher. Belcher was still coming at him, so Wofford started shooting as he pushed Belcher away, fearing Belcher would kill him. Wofford did not know where James had gone during the scuffle. He went to the front door, saw James and Hellems in the car and Smith outside it and thought one of them might be getting another gun. He told them to leave. Wofford closed the front door, then went out the side door, got in his SUV, and left. He wrapped up the gun and threw it in a dumpster away from his house.

Wofford shot Belcher six times—twice in the head, once in the arm, and three times in the chest. Three or four of the shots resulted in head and chest wounds that would have been independently fatal.

Shull testified she did not hear Belcher and Wofford arguing, she only heard several gunshots shortly after Belcher walked in. Wofford came out the side door

---

[3] Wofford did go to his residence. He then met someone at a friend's house, texted a friend that Belcher was coming over, and had a fourteen-minute call with that same person.

a few minutes later and left in his vehicle. Shull entered the house and saw Belcher laying on the floor. She tried to call Wofford, but he did not answer. She "panicked and grabbed a plastic garbage bag and the dustpan and scraped the floor" cleaning up the blood near Belcher's head, then placed the garbage bag with the blood, dustpan, and rags outside the side door.[4] She testified she moved the chair a little bit to clean up the blood, but otherwise did not move anything in the room. Shull then went outside and started walking up and down the street, talking on the phone with Wofford. Wofford picked her up, and they started to argue about who would call the police—Wofford never did explain to Shull what had happened. They drove around for a while, then returned to their neighborhood, drove by the house once, then they parked but did not go inside. At 3:45 p.m., Wofford called 911.

Meanwhile, at 2:49 p.m., law enforcement had been called to the intersection of Martin Luther King Jr. Parkway and Hickman with a report of shots fired in the area. The officers did not have a specific address, so drove around the area, looking for a place to start the investigation. Around 3:15 p.m., Smith flagged them down by the gas station. Smith told them a friend had gone in a house on Francis Avenue, she heard shots, and her friend never came out. Smith did not give a specific address and refused to get in the car to show them the house. The officers drove down the street she told them, hoping to find witnesses.

In Wofford's 911 call, he reported, "Somebody got shot in my house." When the 911 operator asked where the victim was shot, Wofford said "I don't know,

---

[4] The police found this bag at the far end of the yard on the other side of the fence in back. It contained nearly ten ounces of blood, a bullet and a bullet casing.

man, I just see some blood on the floor." Wofford said he looked like he'd been shot or stabbed. When Wofford reported Belcher was not breathing, the operator tried to walk him through CPR, but Wofford said, "I can't handle this" and they should just get somebody there because Wofford didn't want to be touching him. Shull got on the phone sounding extremely upset and told the operator she had just gotten off work and this guy was laying on her floor.

When police officers arrived in response to Wofford's call, Wofford and Shull were in the driveway. Shull told an officer she came in and he was "laying there on the floor" after Wofford picked her up from work. Wofford appeared calm and told officers they just walked in and found Belcher on the floor.

A crime scene technician testified about the scene, noting a "very wobbly" table in the living room with a fish bowl on it. Next to the table was a loveseat that had a photo envelope sitting on an arm. Approximately three feet across the room was a couch. Casings were found on the couch seat, on the floor in front of the couch, on the arm of the loveseat by the photo envelope, on the back of the loveseat, and behind the loveseat. An additional casing was found in the garbage bag with the blood Shull cleaned up. A small table between the couch and loveseat was pushed up against the front of the couch; nothing on the lower shelves of the table looked disturbed. A trajectory determination of one bullet placed the shooter in the same corner as the wobbly table, a location supported by the casings on and around the loveseat. A firearms expert testified that due to recoil from the gun, a shooter has to reacquire their target before firing a second round. He demonstrated use of the same type of firearm as used in Belcher's homicide; the spent cases ejected to the right of the weapon. The medical examiner testified

Belcher's head wounds were from gunshots fired from at least twenty-four inches away.

Following the jury trial in March 2021, Wofford was convicted of murder in the first degree. Wofford appeals, challenging the sufficiency of the evidence relating to his justification defense.

**II. Standard of Review.**

"In evaluating sufficiency-of-evidence claims, we will uphold a verdict if substantial evidence supports it." *State v. Wilson*, 941 N.W.2d 579, 584 (Iowa 2020) (citation omitted). "If the evidence could convince a rational trier of fact the defendant is guilty of the charged crime beyond a reasonable doubt, it is substantial." *State v. Shanahan*, 712 N.W.2d 121, 134 (Iowa 2006). The evidence is viewed in the light most favorable to the State. *Wilson*, 941 N.W.2d at 584.

**III. Analysis.**

When a defendant raises justification as a defense, the State is required to prove he or she acted without justification. *Shanahan*, 712 N.W.2d at 134. This requirement was included in the marshalling instruction given to the jury:

> 1. On or about August 31, 2019, [Wofford] shot John Belcher.
> 2. John Belcher died as a result of being shot.
> 3. [Wofford] acted with malice aforethought.
> 4. Either:
>     a. [Wofford] acted willfully, deliberately, premeditatedly and with a specific intent to kill John Belcher; or
>     b. [Wofford] was participating in the forcible felony of Willful Injury Causing Serious Injury and in committing this crime committed more than a single act.
> 5. [Wofford] acted without justification.

Wofford asserts the State failed to prove he acted without justification.

Iowa Code section 704.3 (2021) sets parameters for the use of a justification defense: "A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself or another from any actual or imminent use of unlawful force." Reasonable force is defined as:

> [T]hat force and no more which a reasonable person, in like circumstances, would judge to be necessary to prevent an injury or loss and can include deadly force if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat.

Iowa Code § 704.1(1). "A person may be wrong in the estimation of the danger or the force necessary to repel the danger as long as there is a reasonable basis for the belief of the person and the person acts reasonably in the response to that belief." *Id.* § 704.1(2).

The use of force generally is not justified when it can be avoided, but a person not engaged in illegal activity has no duty to retreat if they are lawfully present. *State v. Ellison*, 985 N.W.2d 473, 477 (Iowa 2023).

The jury was instructed on justification and reasonable force:

> A person may use reasonable force to prevent injury to a person, including the defendant. The use of this force is known as justification.
> Reasonable force is only the amount of force a reasonable person would find necessary to use under the circumstances to prevent death or injury.
> A person can use deadly force against another if it is reasonable to believe that such force is necessary to avoid injury or risk to one's life or safety or the life or safety of another, or it is reasonable to believe that such force is necessary to resist a like force or threat.
> The State must prove the defendant was not acting with justification.

The jury was also instructed that if the State proved any of the following, Wofford was not justified in his use of force:

1. The defendant started or continued the incident which resulted in injury or death.
2. An alternative course of action was available to the defendant.
3. The defendant did not believe he was in imminent danger of death or injury and the use of force was not necessary to save him.
4. The defendant did not have reasonable grounds for the belief.
5. The force used by the defendant was unreasonable.

The State asserts it proved all five alternatives to show Wofford was not justified in shooting Belcher.

In its closing argument, the State walked through the evidence with the jury to explain Wofford's story was not true, from false and misleading statements to law enforcement, to bullet trajectories and shell casings whose locations did not match Wofford's testimony.

The State also pointed out inconsistencies in Wofford's story. After Wofford had been avoiding Belcher, he called Belcher the afternoon of August 31 but did not say why. Wofford agreed he owed Belcher money at the time. Wofford and Smith's testimony matched that Belcher was not carrying a gun when he entered Belcher's house. At that point, their testimony diverged, with Wofford testifying James entered the house with Belcher and handed Belcher a gun, prompting a physical altercation between Wofford and Belcher, and James leaving at some point without helping Belcher or Wofford during the fight. In contrast, Smith's testimony reflected an argument between Wofford and Belcher but James never

entered the house at all, and Shull testified she thought she saw Belcher walk by towards the front door but did not mention seeing a second person with him.

Wofford then sent Smith, James, and Hellems away without saying what happened to Belcher. To get to the front door to tell them to leave, he would have had to step over Belcher. Wofford then went back inside, out the side door, drove away, got rid of the weapon, and then told law enforcement a false story when reporting the death. The pictures and video evidence of the scene and Wofford do not show clear signs of a physical altercation on the persons of Belcher and Wofford or in the room.[5]

On our consideration of all the evidence in the light most favorable to the jury's verdict, we conclude a reasonable jury could find Wofford was not justified in shooting Belcher to death. We affirm Wofford's conviction.

**AFFIRMED.**

---

[5] Wofford had a bleeding cut on his right index finger when police arrived, but he told police and testified it happened in his vehicle the night before, not during the fight.