# IN THE COURT OF APPEALS OF IOWA

No. 13-1013
Filed September 17, 2014

**SHALONDA GREEN,**
    Applicant-Appellant,

**vs.**

**STATE OF IOWA,**
    Respondent-Appellee.
_____

Appeal from the Iowa District Court for Polk County, Douglas F. Staskal,

Judge.


Shalonda Green appeals from the district court's denial of her second

application for postconviction relief. **AFFIRMED.**


Christopher Kragnes of Kragnes & Associates, P.C., Des Moines, for

appellant.

Thomas J. Miller, Attorney General, Heather Ann Mapes, Assistant

Attorney General, John P. Sarcone, County Attorney, and Michael T. Hunter,

Assistant County Attorney, for appellee State.


Considered by Danilson, C.J., and Vogel and Bower, JJ.

**VOGEL, J.**

Shalonda Green appeals from the district court's denial of her second application for postconviction relief. She asserts that trial counsel was ineffective for failing to request a jury instruction on voluntary manslaughter and for not pursuing an insanity defense, and that postconviction and appellate counsel were ineffective for not making these claims in a previous proceeding, given that these claims were then waived. Because both of Green's claims are meritless, postconviction and appellate counsel were not ineffective for failing to raise them in a previous proceeding, and we affirm the district court's denial of Green's application.

On November 8, 2002, following a jury trial, Shalonda Green was convicted of first-degree murder in violation of Iowa Code sections 707.1 and 707.2(1), (5) (2001). In affirming Green's conviction, our court recited the following background facts:

> In his six short years, Charles Green experienced many forms of abuse. He was born on February 6, 1996, to Kizzie Evans and Tu-mma Green. Tu-mma was no longer involved with Kizzie when Charles was born. Charles was abused by Kizzie and was removed from her home when he was between the ages of nine and twelve months. As a result, he was placed with his maternal uncle. Two years later, Charles was again removed because of suspected abuse in that home. He was subsequently placed in a group home until October of 2001, when he was reunited with his father in Des Moines.
> Tu-mma had married Shalonda before this placement. They had two children together, Tu-mma Jr. and Tamia. Shalonda also had a child from a previous relationship, Devonti, who lived with the family.
> Charles presented his family with many challenges. He acted out at school. He threw tantrums and soiled himself when he did not get his way. In addition, he could not be left alone with Tamia because he had previously touched her in a sexual manner.

On March 13, 2002, Charles had a tantrum and threw himself on the floor. In the process, he hit his head on the corner of the stairs. He sustained a large gash, and Shalonda took him to the hospital. He was examined in the emergency room where he was diagnosed as having superficial injuries on the left parietal area of his skull. The wound was stapled, and the injury was not considered serious.

On March 15, 2002, Charles was choked by his father. Tu-mma became upset with Charles after a bad report from school. Tu-mma picked him up by the neck, shook him, and then put him back down. Shocked by his own actions, Tu-mma left the house to cool off.

On March 18, 2002, the children were home for spring break. Tu-mma had left for work around 4:30 a.m., and Shalonda was the only adult supervising the children. When Charles awoke that morning, he complained of a headache. Shalonda gave him Motrin and told him to lie back down. She then departed from the house with two of the children, leaving Charles and Devonti home alone. Upon her return, Shalonda learned Charles had not stayed in his room as she had instructed. Instead, he had been running around the house. Shalonda became upset because Charles had not obeyed her orders.

Shalonda picked Charles up by the shoulders and pushed him against the wall. She told him she wanted to choke him. She then took him upstairs to the bedroom to discipline him. Once in the room, Shalonda got on her knees and ordered Charles to come at her. Shalonda shoved him away when Charles did as he was told. She stated she wanted him to cry and feel bad. She became angrier when Charles ignored her. She pushed him again and told him to hit her. Shalonda continued pushing Charles until he pushed her back. Shalonda then punched him in the chest. At that point, Charles became frightened and told Shalonda he wet his pants. This caused Shalonda to become extremely upset. She repeatedly punched Charles with a closed fist and choked him. She then stood up and kicked the child. He fell backward, then forward to his hands and knees. He tried to get up. Shalonda kicked him again knocking him completely to the floor. Shalonda then paused in the assault and left the room.

Shalonda's friend Asha Brown stopped by to visit shortly after the incident in the bedroom. She stayed and conversed with Shalonda for approximately forty minutes. They both remained in the living room of the house during the visit. After Brown left, Shalonda took a moment to call Tu-mma and then went back upstairs. She found Charles still lying on the floor.

Shalonda again kicked Charles in his side. She then left to pick up clothing and laundry in the bedrooms and bathroom. The next time she looked in the bedroom, Charles was still lying on the

floor. She heard him take a deep breath and gurgle. Shalonda immediately attempted to revive him by calling his name and slapping him on the face. She then called 911.

The Des Moines Fire Department was called to the scene where they found Charles on the floor with his face up and eyes open. His heart was not beating. Their initial efforts to resuscitate him were unsuccessful. Charles was transported to Blank Children's Hospital where doctors were able to get his heart pumping again. Although Charles's heart was beating, doctors were unable to fully revive him. The child was pronounced clinically brain dead on March 20, 2002. He was subsequently taken off his respirator.

*State v. Green*, 0-061/09-0706, 2010 WL 893909, at *1–2 (Iowa Ct. App. April 28, 2004).

Our court affirmed the district court's denial of Green's first postconviction application, *see Green v. State*, 09-0706, 2010 WL 1052079 (Iowa Ct. App. March 24, 2010), in which she argued trial counsel was ineffective for failing to object to alleged prosecutorial misconduct, and by not introducing evidence of the polygraph test administered by police. On January 3, 2012, Green filed this second postconviction relief application. The district court denied the application, stating the claims presented were waived due to Green's failure to previously raise them, and that the arguments also failed on the merits. Green appeals, arguing that, to the extent the district court properly concluded these claims were waived, postconviction and appellate counsel were ineffective for failing to present them at a previous hearing.

We review ineffective-assistance-of-counsel claims de novo. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). To succeed on this claim, the defendant must show, first, that counsel breached an essential duty, and, second, that he was prejudiced by counsel's failure. *Id.* We note that counsel is

not ineffective for failing to pursue a meritless issue. *State v. Greene*, 592 N.W.2d 24, 29 (Iowa 1999).

Upon review of the record, we conclude the district court properly found both Green's claims failed on the merits. With regard to the voluntary manslaughter instruction, Iowa Code section 707.4(1) states:

> A person commits voluntary manslaughter when that person causes the death of another person, under circumstances which would otherwise be murder, if the person causing the death acts solely as the result of sudden, violent, and irresistible passion resulting from serious provocation sufficient to excite such passion in a person and there is not an interval between the provocation and the killing in which a person of ordinary reason and temperament would regain control and suppress the impulse to kill.

Iowa Code § 707.4(1); *see also id.* § 707.4(3) (noting voluntary manslaughter is a lesser-included offense of murder in the first or second degree).

The record in this case does not support a jury instruction under this statute, particularly given that, as a matter of law, a child cannot provoke a defendant to commit the crime of voluntary manslaughter. *See State v. Taylor*, 452 N.W.2d 605, 606 (Iowa 1990) (holding an eight-month-old child cannot "provoke" an adult under the voluntary manslaughter statute). Furthermore, when submitting a jury instruction for a lesser-included offense, the facts of the case must support the essential elements of the offense, a requirement not supported by this record. *See State v. Royer*, 436 N.W.2d 637, 642–43 (Iowa 1989) (holding that supporting facts are necessary when submitting a jury instruction for a lesser-included offense). Consequently, trial counsel did not err in failing to request that this instruction be submitted to the jury, nor did appellate or postconviction counsel breach an essential duty by failing to raise this

argument earlier. *See State v. Shanahan*, 712 N.W.2d 121, 142 (Iowa 2006) (noting counsel has no responsibility to propose instructions that are not supported by substantial evidence or do not accurately reflect the law).

Nor does the record support Green's claim that trial counsel was ineffective for failing to investigate or assert an insanity defense, specifically, one based on post-partum depression. Green has presented no evidence, either at trial or in her current application, showing she suffered from a mental disability such that she was unaware of the nature of her actions at the time of her crime or that she was unable to distinguish right from wrong. *See* Iowa Code § 701.4 (defining the insanity defense as necessitating that the defendant show "a diseased or deranged condition of the mind [that] render[s] the person incapable of knowing the nature and quality of the act the person is committing or incapable of distinguishing between right and wrong in relation to that act."). Green's testimony at trial relied on her claim that she lied in her confession to the police, not that she suffered from a mental disability. There was no indication, from either the record or Green's statements, that trial counsel should have investigated her mental state. Rather, at the postconviction hearing, Green testified she never discussed her mental health with trial counsel. Given this lack of record, Green has failed to establish trial counsel was ineffective for failing to investigate or argue the insanity defense at trial, and therefore appellate and postconviction counsel were not ineffective for failing to raise this claim previously. *See Ledezma v. State*, 626 N.W.2d 134, 142 (Iowa 2001) (stating it is the defendant's burden to show both prongs of her ineffective-assistance claim by a preponderance of the evidence).

Having considered Green's arguments, we affirm the district court's denial of her application for postconviction relief.

**AFFIRMED.**