# IN THE COURT OF APPEALS OF IOWA

No. 16-0533
Filed December 6, 2017

**STATE OF IOWA,**
          Plaintiff-Appellee,

**vs.**

**MARTEZ DEROY SMITH,**
          Defendant-Appellant.
_____

Appeal from the Iowa District Court for Black Hawk County, George L. Stigler, Judge.

A defendant challenges his convictions and sentences. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Theresa R. Wilson, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.

Heard by Danilson, C.J., Mullins, J., and Carr, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2017).

**CARR, Senior Judge.**

Martez Smith appeals from his convictions and sentences for murder in the first degree, in violation of Iowa Code sections 707.2(1), 902.1(1), and 910.3B(1) (2015), and domestic abuse assault, in violation of section 708.2A(2)(a). On appeal, he contends (1) he received ineffective assistance of counsel when his counsel failed to move for dismissal as a result of a speedy-indictment violation, (2) he received ineffective assistance of counsel when counsel failed to object to prosecutorial misconduct, (3) the trial court abused its discretion in admitting certain evidence, and (4) the trial court abused its discretion in denying counsel access to a police officer's disciplinary records. He also raises three pro se claims: that an instruction was improper, that he received ineffective assistance when counsel abandoned two potential defenses, and that his due process rights were violated by the cumulative effect of certain alleged errors.

## I. Background Facts and Proceedings

On November 25, 2014, Shawonyta Norman visited his sister, Latres Johnson, at the home she shared with her boyfriend Martez Smith. At one point in the afternoon, Johnson was putting up a baby gate to confine her two dogs when Smith yelled at her and pushed her into the baby gate. She fell into the gate, breaking it, and sustaining cuts on her ankle, arm, and neck. Soon afterwards, Norman told Smith to stop fighting and to stop speaking to his sister in the insulting language Smith had been using. The situation between Smith and Norman, however, appeared to calm down, as the men later briefly hugged.

Smith then went to the basement. When he returned, he asked Norman to join him outside. Within ten minutes, Johnson thought she observed "scuffling"

outside and went to check on the two men. Norman was by then coming up steps to the house and saying "he stabbed me" and "I'm not going to make it." Johnson helped Norman inside. She slammed the door shut and locked it. She called 911. Paramedics arrived and performed CPR before transporting Norman to a nearby medical center. Norman was pronounced dead roughly an hour later.

Smith was arrested soon thereafter. On November 26, he appeared before a magistrate and was charged with domestic abuse assault causing bodily injury. On January 29, 2015, an arrest warrant issued against Smith for the crime of first-degree murder. He was arrested in jail and charged with murder.

The case eventually proceeded to a jury trial. Following trial, Smith was found guilty of domestic abuse assault and of first-degree murder. Smith was sentenced to life without the possibility of parole on the murder charge and to five years with a mandatory minimum sentence of one year on the assault charge. The two sentences were ordered to run consecutively. Smith was also assessed costs, a fine, and a restitution payment. He now appeals.

## II. Standard of Review

The right to effective assistance of counsel finds its moorings in the Sixth Amendment. *State v. Clay*, 824 N.W.2d 488, 494 (Iowa 2012); *see* U.S. Const. amend. VI. When a defendant asserts a constitutional violation, our review is de novo. *See Taylor v. State*, 352 N.W.2d 683, 684 (Iowa 1984).

Evidentiary rulings are reviewed for an abuse of discretion. *See State v. Buenaventura*, 660 N.W.2d 38, 50 (Iowa 2003).

## III. Analysis

### A. Speedy Indictment

Smith claims he received ineffective assistance of counsel when trial counsel failed to move for dismissal of Smith's murder charge for a speedy-indictment violation.

Ineffective assistance of counsel "is deficient performance by counsel resulting in prejudice, with performance being measured against an 'objective standard of reasonableness,' 'under prevailing professional norms.'" *Rompilla v. Beard*, 545 U.S. 374, 380 (2005) (citations omitted). "[W]e measure counsel's performance against the standard of a reasonably competent practitioner." *State v. Maxwell*, 743 N.W.2d 185, 195 (Iowa 2008). Prejudice exists if there is "a reasonable probability that, but for the counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 196. "A defendant's inability to prove either element is fatal." *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003).

The incident that led to Smith's arrests and convictions occurred on November 25, 2014. He was arrested for domestic abuse assault by November 26. A criminal complaint charging Smith with murder was filed on January 29, 2015. A trial information on the murder charge was filed on February 9.

The speedy-indictment rule requires that Smith be indicted for a charge within forty-five days of his arrest. *See* Iowa Ct. R. 2.33(2)(a). Smith effectively raises two questions: (1) does his arrest for domestic abuse assault qualify as an arrest on his murder charge, and (2) if not, when was he arrested for murder? Two recent cases have answered these questions definitively. In *State v. Penn-Kennedy*, 862 N.W.2d 384, 390 (Iowa 2015), our supreme court reiterated that the

speedy-indictment rule does not apply "to all offenses arising from the same incident or episode." The rule does not require a prosecution to commence "before crucial evidence is available" on greater charges. *Penn-Kennedy*, 862 N.W.2d at 390; *see also State v. Burton*, 231 N.W.2d 577, 578 (Iowa 1975) (holding State is not limited "to a single charge from one episode"). Thus, Smith's arrest for purposes of domestic abuse assault does not also necessarily count as his arrest for murder.

Then, in *State v. Williams*, 895 N.W.2d 856, 865 (Iowa 2017), the supreme court clarified that the speedy-indictment clock begins running when a defendant is arrested and brought before a magistrate. Here, on the murder charge, that occurred no earlier than January 29, 2015, and we can definitively say it did not occur at the time of the arrest for domestic abuse assault because at that time Smith was not taken into custody "in the manner authorized by law" on allegations of murder. *See Williams*, 895 N.W.2d at 865–67. A trial information was filed on February 9, within the forty-five-day limit. This indictment was therefore timely. Counsel does not provide ineffective assistance in failing to raise a meritless claim. *State v. Schaer*, 757 N.W.2d 630, 637 (Iowa 2008) ("Counsel has no duty to raise an issue or make an objection that has no merit."). Smith's claim fails under the current state of the law.

Smith, however, argues we should decide the case under pre-*Williams* principles. Prior to *Williams*, the test of whether a person was arrested for purposes of speedy indictment required "determin[ing] whether a reasonable person in the defendant's position would have believed an arrest occurred." *State v. Wing*, 791 N.W.2d 243, 249 (Iowa 2010). We are skeptical *Williams* does not

have retroactive application.[1] *See State v. Ragland*, 836 N.W.2d 107, 114 (Iowa 2013) ("Normally, procedural changes do not apply retroactively, while substantive rules of law and watershed rules of criminal procedure have retroactive application."). But we concede our supreme court has not addressed the issue.

Still, the resolution remains the same. After the instigating incidents at his home, Smith went to a local bar, where he hid in the cooler. At trial, Smith was asked the following questions about his time in the cooler:

> Q. Okay. Why did you hide in the cooler? A. I didn't want to go to jail.
> Q. Okay. Why did you think you were going to jail? A. Because Latres told me she was calling the police on me.
> Q. When did she tell you she was calling the police on you? A. About the time she fell down over there by the baby gate when I start[ed] laughing at her.
> Q. Okay. So you hid in the cooler because you thought Latres had called the police? A. Correct.

Smith was subsequently arrested. As stated above, he was charged initially only with domestic abuse assault causing bodily injury. This is not a case where a defendant could reasonably argue he believed he was not arrested. *Cf. Wing*, 791 N.W.2d at 250–52 (collecting cases). Smith admitted on the stand he was arrested. His argument is rather that he was arrested for murder at the same time as he was arrested for the domestic abuse assault. His testimony, however, belies that assertion. Smith believed the police were looking for him. He believed Johnson had called 911 after their argument—that is, prior to the incident with Norman. He believed he may have gone to jail based on that 911 call. Indeed,

---

[1] We are additionally skeptical Smith can prove any prejudice: had he prevailed on this claim below, the State would likely have appealed the issue, and instead of *Williams*, we would have a hypothetical *Smith*, reaching the same result.

Smith additionally testified he had been convicted of assaulting Johnson before, suggesting familiarity with the process. We conclude a reasonable person in Smith's position would have believed an arrest for domestic abuse assault occurred at the time of Smith's initial arrest, based on Smith's beliefs as to when and why the police were called and the charging documents in the matter. A reasonable person in Smith's position would not have had reason to conclude an arrest for murder occurred at the time. Smith's claim fails.

### B. Prosecutorial Misconduct

Smith next claims his counsel was ineffective because counsel failed to object to prosecutorial misconduct in the form of statements during closing argument that went beyond the evidence presented at trial. The challenged statements essentially concern two topics: (1) the relative physical positions of the assailant and Norman during the stabbing altercation and (2) the disparity between the number of stab wounds Norman sustained and the number of holes in his shirt. The prosecutor advanced a theory purporting to synthesize Smith's left-handedness, the angle and direction of Norman's stab wounds, and a cut Smith sustained. The theory required "suppos[ing] that the two people are not facing one another and that the stabber is standing behind the victim and reaching around and stabbing." As to the disparity between the number of holes in Norman's shirt and the number of wounds he sustained, the prosecutor told the jury, "If it's been bunched up, lifted up and bunched up, so that the wounds to the—the holes to the shirt are now higher on the body underneath the clothing, and because it's bunched up, that a hole would produce multiple holes in the folded-up clothing, but only one wound to the body." Smith objects there was no evidence on how the

assailant and Norman were standing and the prosecutor's statements amounted to speculation and testimony.

A prosecutor has wide latitude in making a closing argument. *See Clayton v. Roper*, 515 F.3d 784, 792 (8th Cir. 2008); *State v. Phillips*, 226 N.W.2d 16, 19 (Iowa 1975). A prosecutor is allowed to draw conclusions and argue permissible inferences that may be reasonably derived from the evidence. *State v. Shanahan*, 712 N.W.2d 121, 139 (Iowa 2006). The prosecutor cannot misstate the law, assert a personal opinion, or create evidence. *Id.* at 139-40. This does not preclude all personalized remarks, though; "it merely precludes those that do not appear to be based on the evidence." *State v. Williams*, 334 N.W.2d 742, 745 (Iowa 1983).

Smith is the only living eyewitness to the stabbing. He recalled "grappling" with Norman but did not testify about the relative positions of the two at the time. The evidence did not establish why the number of stab wounds and holes in Norman's shirt differed. However, nothing in the prosecutor's closing argument went beyond the wide latitude afforded him. It was unknown how Smith and Norman stood when the stabbing occurred. However, the evidence did establish the defendant was left-handed, did establish a knife was used to stab the victim, and did establish the location of the stab wounds on Norman's body. The medical examiner testified about the trajectory of the wounds. The prosecutor's statements were conclusions and permissible inferences reasonably derived from the evidence presented, as were the prosecutor's statements about the victim's shirt bunching up. The prosecutor argued permissible inferences. We find no misconduct here. *See Graves*, 668 N.W.2d at 869 (requiring "misconduct" to establish prosecutorial misconduct).

Smith argues the prosecutor was testifying about an area that should be left to experts. We have already discussed our disagreement that the prosecutor was testifying. We additionally disagree that this area necessarily be left to experts. The medical examiner testified he would be able to establish "relative trajectory" of the knife that caused the stab wounds if he knew the combatants' positions and that he was unable to make a determination of their positions without a "starting point." In short, he testified he lacked all the necessary information to reach a conclusion. This is, in essence, expert testimony on the nature of the information necessary to reach the conclusion Smith argues requires expert testimony. *See* Iowa R. Evid. 5.702 (defining expert testimony to include "scientific, technical, or other specialized knowledge"). Yet in this case—and in any other without eyewitnesses or willing confessors—that information would necessarily be proven by circumstantial evidence from which it could be inferred. Under Smith's proposed rule, no inferences could be drawn about the relative positions of the assailant and victim because no expert testimony was offered—indeed, none could be—on those positions. Jurors need not abandon that logic upon entering the jury box. *See State v. Manning*, 224 N.W.2d 232, 236 (Iowa 1974). Expert testimony is not required to allow the jury to make an inference about the relative positions of two individuals. All our law requires is sufficient evidentiary support for any inference. *See State v. Kemp*, 688 N.W.2d 785, 789 (Iowa 2004). Although Smith does not directly challenge the sufficiency of the evidentiary support for this inference, we believe our discussion above concluding the prosecutor argued permissible inferences answers the argument nonetheless.

For the foregoing reasons, it was not ineffective assistance to fail to object. *See Schaer*, 757 N.W.2d at 637.

## C. Evidentiary Claims

Smith next argues the district court abused its discretion in admitting certain evidence. Specifically: (1) evidence regarding Smith's prior conviction for domestic assault against Johnson and other evidence of his domestic abuse of Johnson, (2) evidence regarding a witness's criminal mischief conviction involving Norman, and (3) a photograph of a tattoo on Smith's back. Smith preserved error on the third claim by objecting to admission of the photograph. He did not preserve error on the first two claims, so we analyze them under an ineffective-assistance rubric. *See State v. Ondayog*, 722 N.W.2d 778, 784 (Iowa 2006) ("Ineffective-assistance-of-counsel claims are not bound by traditional error-preservation rules.").

The defendant asked the district court to prohibit testimony on his relationship with Johnson through a motion in limine. In a pre-trial order, the district court denied that request.[2] It ruled: "[T]he court overrules the defense's application to not permit testimony as to the turbulent history between Martez Smith and the alleged victim in the domestic abuse case, Latres Johnson. The court finds this to be relevant, especially in the domestic abuse case and [the evidence] also sets the stage for a better understanding of the alleged events between the defendant and Mr. Norman."

---

[2] As noted above, we believe this was insufficient to preserve error. "Ordinarily, error claimed in a court's ruling on a motion in limine is waived unless a timely objection is made when the evidence is offered at trial." *Schaer*, 757 N.W.2d at 634.

Smith now contends it was an abuse of discretion to admit evidence on this "turbulent" relationship. He argues, as a serious misdemeanor, his conviction for domestic abuse assault would not be a proper one with which to impeach him. *See* Iowa R. Evid. 5.609(a)(1). He also argues the evidence was inadmissible prior-bad-acts evidence. *See* Iowa R. Evid. 5.404(b). He also argues it was irrelevant to the murder charge. *See* Iowa Rs. Evid. 5.401-.402.

This evidence was admissible, and it was not an abuse of discretion to admit it. *See State v. Rodriquez*, 636 N.W.2d 234, 239 (Iowa 2001) ("An abuse of discretion occurs when the trial court exercises its discretion 'on grounds or for reasons clearly untenable or to an extent clearly unreasonable.'" (citation omitted)). Evidence of the couple's tumultuous relationship was relevant to show, for instance, the nature of their relationship. This goes beyond impeaching Smith or attempting to show Smith acted in conformity with some prior character. *Cf.* Iowa Rs. Evid. 5.404(b), .609(a)(1). It gets to the heart of how the two related to each other and understood each other. And it would have been relevant to the murder charge to explain the genesis of the discord with Norman. Counsel was not ineffective for failing to object to the admission of this evidence. *See Schaer*, 757 N.W.2d at 637.

Next, Smith directs our attention to an exchange between the State and a defense witness. Although a pre-trial ruling allowed the State to ask the witness if she had been previously convicted of a felony or a crime of dishonesty—she had, fifteen times—the ruling did not permit the State to delve into the specifics of her offenses. *See State v. Willard*, 351 N.W.2d 516, 518–19 (Iowa 1984) (noting it is "permissible, for impeachment purposes, to inquire into the specific *nature* of a

witness' prior felony conviction" but not the details of the crime itself).  The State asked the witness, "You had been ordered not to have any contact with [Norman] because you had damaged his truck; isn't that right?"  Smith contends that question impermissibly delved into the specifics of the witness's crime.

Examining this argument through the lens of ineffective assistance of counsel, we conclude there was no prejudice to Smith from his counsel's failure to object to this question.  The question was a minor one in the scheme of this trial.  The challenged information solicited—that the witness did some damage to Norman's truck—has little bearing on her credibility or on the outcome of the case.  The theories advanced by Smith are that this information would lead the jury to believe Norman was a victim in need of protection, that he was a peaceful person, or that he was weak.  These are unlikely conclusions to draw from one question.  This argument fails.

Last, Smith objects to the admission of a photograph of his back, showing a tattoo featuring the words "Global Gangsta."  He contends the photograph was unfairly prejudicial.  See Iowa R. Evid. 5.403.  He seemingly argues the jury could have been led to believe he was a member of a gang from this tattoo.  "[E]vidence of gang membership and activity is inherently prejudicial.  It appeals to the jury's instinct to punish gang members."  State v. Nance, 533 N.W.2d 557, 562 (Iowa 1995).

We conclude the court did not abuse its discretion in admitting this photograph.  The evidence was relevant to show Smith did not sustain injuries to his back, which corroborates other testimony about Smith's condition.  It was also relevant to show the completeness of the police investigation, especially when

considered in the context of its joint submission into evidence with several other photographs of Smith. The trial court did not abuse its discretion in balancing this probative value, however slight, with any minor prejudice obtained by showing the tattoo. There was no mention of gangs during the trial. *Cf. State v. Caples*, 857 N.W.2d 641, 647 (Iowa Ct. App. 2014) (distinguishing *Nance* where "presentation of gang evidence was limited"); *State v. Thomas*, No. 03-1642, 2005 WL 1224585, at *3 (Iowa Ct. App. May 25, 2005) (distinguishing *Nance* where prosecution "presented no evidence that defendant was actually a gang member or involved in gang activity"); *State v. Dixon*, No. 00-829, 2001 WL 1450991, at *4 (Iowa Ct. App. Nov. 16, 2001) (distinguishing *Nance* where "no evidence was presented to suggest that either Dixon or James was a gang member"); *State v. James*, No. 00-831, 2001 WL 803814, at *4 (Iowa Ct. App. July 18, 2001) (distinguishing *Nance* where "there was no evidence that the defendant or his codefendant were members of a gang"). No one commented on the tattoo. Additionally, we think it unlikely anyone would infer gang membership from a tattoo of this sort. *See generally* John E. Theuman, Annotation, *Admissibility of Evidence of Accused's Membership in Gang*, 39 A.L.R. 4th 775 (1985) (collecting cases in which, generally, gang tattoos identify specific gang or gang-related activity). We conclude there was no abuse of discretion in admitting this photograph.

### D. Disciplinary Records

Finally, Smith argues the district court abused its discretion by denying him access to disciplinary records of a police officer involved in the investigation of the case. The officer in question did some preliminary work at the crime scene and supervised some of the work done on the case thereafter. The officer played

almost no role in the actual investigation. Despite that, Smith seeks access to the officer's disciplinary record. Smith points to no evidence suggesting anything in the file would be relevant to this case or the officer's handling of his duties on this case. After examining the file *in camera*, the district court ruled: "I will preserve [the disciplinary file] for record purposes under seal, but it has nothing at all to do with anything even remotely touching upon Mr. Smith's circumstances. So I am not going to turn it over to the defense."[3] We presume personnel records are confidential. *See* Iowa Code § 22.7(11)(a); *Am. Civil Liberties Union Found. v. Records Custodian*, 818 N.W.2d 231, 235–36 (Iowa 2012); *Doe v. Univ. of Iowa*, No. 12-0357, 2013 WL 85781, at *2–3 (Iowa Ct. App. Jan. 9, 2013). Smith argues his "fundamental interest in accessing the records . . . to determine whether they contain evidence material to the outcome of his case" outweighs the officer's interest in maintaining confidentiality. We disagree. On this record, we conclude the district court did not abuse its discretion in preventing Smith's access.

### E. Pro Se Claims

Smith raises additional claims pro se. His first claim is that the jury instructions marshaling the elements of murder were inadequate under *State v. Heemstra*, 721 N.W.2d 549, 558–59 (Iowa 2006), because "we have no indication as to which basis of guilt the jury accepted." He is incorrect. In *Heemstra*, the crime of willful injury was submitted to the jury as a potential predicate felony for a felony-murder conviction. 721 N.W.2d at 552–53. Here, willful injury was submitted as a lesser crime the jury could consider if and only if it declined to

---

[3] We have reviewed the disciplinary file and agree with the district court's evaluation of its relevance.

convict Smith of murder and several other crimes. Willful injury was not submitted to the jury as a basis for a murder conviction. Under the submitted jury instructions, by finding Smith guilty of first-degree murder, the jury found he "acted with malice aforethought" and "acted willfully, deliberately, premeditatedly, and with specific intent to kill Shawonyta Norman." Therefore, unlike in *Heemstra*, we know "which basis of guilt the jury accepted," and that basis is willful, deliberate, and premeditated murder. *See* Iowa Code § 707.2(1)(a).

Smith's second claim is that he received ineffective assistance of counsel when his trial counsel abandoned defenses of justification and intoxication. The record is not adequate to consider this claim. We preserve it for consideration in a possible postconviction-relief proceeding.

Third, Smith asserts he was denied due process by the cumulative harm done by several individual errors he concedes are harmless in isolation. These errors are: (1) the jury hearing an argument between two persons in the hallway outside the courtroom, (2) the court informing the jury of threats made by a friend of a defendant in another case, (3) the court allowing Johnson to testify with her back to the defendant, and (4) the court allowing admission of a knife into evidence.

Near the end of one day of trial, an audible skirmish broke out in the hallway outside the courtroom. The court quickly adjourned for the day. The next day, outside the presence of the jury, the lawyers and court agreed not to mention the incident further. It does not appear the jury would have been aware whether the parties involved in the altercation were witnesses in the case. We fail to see how this would have any impact on Smith's due process rights.

The court informed the jury of an incident in a recent case in which a member of the public had approached a juror and asked the juror to find the defendant not guilty. The court informed the jury of this incident, which was called a "one in a million" event, by way of explaining how the jury would be moved about the courtroom during the trial. The next day, two jurors were reported to have taken the court's remarks to suggest the possibility of harassment or intimidation as a result of their jury service. Each was questioned by the court on the subject. One juror was excused. The second juror, after a discussion with the court, indicated her concerns had been addressed and remained on the jury. Smith argues this remaining juror was scared and a mistrial should have been declared. There is no evidence the juror was scared following her conversation with the court. This claim has no merit.

Johnson refused to face the defendant during her testimony. We can find no case compelling a witness to face one direction or another. "The Confrontation Clause does not, of course, compel the witness to fix his eyes upon the defendant; he may studiously look elsewhere, but the trier of fact will draw its own conclusions." *Coy v. Iowa*, 487 U.S. 1012, 1019 (1988). Certainly a witness's demeanor may bear upon his or her credibility, but we see no constitutional infirmity in allowing a witness to testify as Johnson did.

A pocket knife that was not involved in the crime was entered into evidence. Smith contends the probative value of this evidence was substantially outweighed by its danger of unfair prejudice. *See* Iowa R. Evid. 5.403. When the knife was admitted, the officer who discovered it testified it was not involved in the case and there was no blood on it. The evidence is relevant to the police investigation in

this matter. It has little to no probative value and virtually zero prejudice to the defendant. We review admissions of evidence for abuse of discretion. *See Mercer v. Pittway Corp.*, 616 N.W.2d 602, 612 (Iowa 2000). We cannot say the court abused its discretion in admitting this evidence.

Cumulatively, there was no constitutional harm done to Smith by these four alleged errors. We conclude no harm resulted from any. We likewise conclude in totality they do not rise to the level of denying Smith due process. *See More v. State*, 880 N.W.2d 487, 499 (Iowa 2016) ("Due process requires fundamental fairness in a judicial proceeding . . . ."); *State v. Willard*, 756 N.W.2d 207, 214 (Iowa 2008) ("At the very least, procedural due process requires 'notice and opportunity to be heard in a proceeding that is "adequate to safeguard the right for which the constitutional protection is invoked."'" (citations omitted)).

**F. Conclusion**

For the foregoing reasons, we affirm Smith's convictions and sentences.

We preserve his ineffective-assistance claim concerning the defenses of justification and intoxication for possible postconviction relief.

**AFFIRMED.**