# IN THE COURT OF APPEALS OF IOWA

No. 19-1748
Filed March 2, 2022

**STATE OF IOWA,**
      Plaintiff-Appellee,

**vs.**

**ABDALLA ELEHAMIR MOUSA,**
      Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Scott D. Rosenberg (motion to suppress), and William P. Kelly (trial), Judges.

Abdalla Mousa appeals his conviction for third-degree sexual abuse. **AFFIRMED.**

Jamie Hunter of Dickey, Campbell & Sahag Law Firm, PLC, Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Sheryl Soich, Assistant Attorney General, for appellee.

Considered by Ahlers, P.J., Potterfield, S.J.,* and Mullins, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2022).

**POTTERFIELD, Senior Judge.**

Abdalla Mousa appeals his conviction for third-degree sexual abuse, contending there is insufficient evidence the sex act was "by force or against the will of" the complainant, C.K. Mousa also asserts the trial court erred in allowing hearsay statements made ten to twelve hours after the incident as an excited utterance; the court improperly instructed the jury and trial counsel were ineffective in requesting an erroneous jury instruction; and the court improperly concluded his waiver of *Miranda* rights[1] was knowing, intelligent, and voluntary. Finding sufficient evidence supports the conviction for third-degree sexual abuse, no error in admitting C.K.'s excited utterances, and that Mousa's *Miranda* waiver was knowing and voluntarily entered, we affirm the conviction. We do not address claims of ineffective assistance of counsel on direct appeal. We therefore affirm.

**I. Background Facts.**

On the afternoon of August 24, 2016, C.K. and her best friend, Lacey, shared a bottle of wine at Lacey's house. At about 7:00 p.m., C.K. drove to a bar, where she and Lacey spent the next few hours drinking. The bartender called a cab to take them home. Lacey was dropped off first at about 11:00 p.m. C.K. declined Lacey's invitation to stay with her overnight. C.K. was dropped off and remembers being at her front gate, unable to find her cell phone or keys in her purse. She next remembers waking up on a couch in the basement of an unfamiliar house. Her skirt was up around her waist and a man was sitting at a nearby table, smoking a hookah.

---

[1] *See Miranda v. Arizona*, 384 U.S. 436, 479 (1966) (requiring police to advise suspects of their constitutional rights before beginning a custodial interrogation).

C.K. ran up the stairs avoiding Mousa's attempts to block her. She ran out the door of the house, yelling and screaming. Mousa followed her outside. At 1:43 a.m. on August 25, he called 9-1-1. The emergency log states the caller reported a woman wearing a blue skirt and black t-shirt. "She is lost and intoxicated. She was dropped off here by yellow cab."

Two police officers responded to the dispatcher's "trip" to the area, and Officer Gretchen Hays located Mousa and C.K. near the curb. C.K. was "heavily intoxicated." Officer Hays described C.K. as "having some trouble standing on her own, swaying, staggered gait. When I got closer to her and started talking to her, her speech was slurred and she smelled like an alcoholic beverage."

Mousa told Officer Hays he had seen C.K. dropped off by a cab in that area where they were standing. He tried to help her figure out where she lived. He was unable to do so, and that's when he decided to call police because he did not know who the woman was or where she was from. Mousa wanted them to figure out how to get her home.

C.K. was disoriented and wanted to go home but did not seem to know where she lived. Officer Hays drove as C.K. gave her several wrong addresses, but they eventually passed a house that looked familiar—it was across the street from Mousa's house and just one or two houses down. After checking the mail, Officer Hays determined it was C.K.'s home and C.K. went inside. Officer Hays noted Mousa was nearby and went back and spoke with him again. The "trip" was closed at 2:11 a.m.

Once home, C.K. began to notice the state of her clothes, her underwear, and her body. The back of her skirt was smeared and stained with dirt, and her

underwear was stiff as if "stuff had dried." She saw fresh bruises along the inside of her thighs and felt severe pain in her vagina. C.K. realized she did not have her cell phone and plugged in her tablet to charge the battery. She slept for a time, and when she awoke, she used her tablet to text Lacey. C.K. also contacted her sister, who drove her back to the bar, where C.K. found her phone on the ground next to her car. C.K. called Lacey and was "hysterical," crying and sobbing. She told Lacey she had been sexually assaulted. C.K. also called her family doctor, went home to retrieve her clothes from the night before, and went to the hospital for a sexual assault exam.

Sexual Assault Nurse Examiner Maridith Morris examined C.K. just after 5:00 p.m. C.K. told Morris she did not remember what had occurred but she believed she had been sexually assaulted. Morris noted bruising on C.K.'s calves, inner thighs, and the side of her breast at the bra line. During the pelvic exam, Morris observed white fluid coming from C.K.'s vagina. C.K.'s cervix was reddened and had an abrasion or scrape on it. C.K. was experiencing vaginal and abdominal pain. Swabs taken from her vaginal area tested positive for seminal fluid, as did the underwear she was wearing before she arrived home. While at the hospital, C.K. spoke with a police officer and gave an initial statement.

Detective Michael DeMoss later spoke with C.K., who told him she believed the person who assaulted her was the cab driver. Detective DeMoss's investigation ruled out the cab driver. Detective DeMoss then investigated phone

calls made to C.K.'s phone—they came from Mousa.[2]  DeMoss telephoned Mousa and asked him to come to the police station.  The next day, Mousa arrived at the station with his five-year-old nephew.  Detective DeMoss spoke with Mousa, explaining there was no one who could stay with the child while they spoke and asking Mousa to return later.

On August 31, Mousa returned to the police station.  Detective DeMoss escorted Mousa to a third-floor interview room and read Mousa his *Miranda* rights.  Mousa signed a waiver, which was written in English.  Mousa is thirty-two years old, was born in Sudan, completed high school in Sudan, and has been in the United States since 2006.  His primary language is Arabic, but the interview was conducted in English.

Detective DeMoss asked Mousa what happened before he called 9-1-1 on August 26.  For the next thirty to thirty-five minutes, Mousa explained—with few interruptions by the detective—he saw a woman being dropped off by a cab.  The two friends who had been with him on his porch left.  Another car drove by on the street, stopped near the woman, and exchanged words with her.  Mousa said he shined a flashlight on the car and it drove away.  He told Detective DeMoss he left his porch and approached the woman to see if he could help her.  Mousa told Detective DeMoss several times the woman was drunk and asked him where her car was, where her cell phone was, and how she got there.  He explained the woman typed her phone number into his phone so he could call and attempt to find

---

[2] There were several calls from Mousa's phone placed on August 25 to C.K.'s number: two calls at 1:16 a.m., five calls at 1:56 a.m., one call at 9:31 a.m., one call at 12:40 p.m., and one call at 3:25 p.m.

it. Mousa told the detective that after about twenty-five minutes of trying to help the woman, she started to call him names. He called 9-1-1. Mousa was there when the police arrived to help the woman and watched as the officers tried to help her find her way home.

The detective asked Mousa if he had any physical contact with the woman and if he hugged or kissed her. Mousa denied any physical contact. He denied the woman had been in his house. After about seventy minutes in the interview, Mousa requested a lawyer and the interview ceased.

A buccal swab was later obtained from Mousa. Lab analysis of the swabs from C.K.'s sexual assault exam matched Mousa's DNA. Mousa was charged with third-degree sexual assault, in violation of Iowa Code sections 709.1 and 709.4(1)(a) (2016).

Mousa filed a motion to suppress his statements made to Detective DeMoss, asserting his waiver of his *Miranda* rights was not knowing and voluntary. He offered the report of a forensic psychiatrist, Dr. Jerome Fialkov, who opined:

> In my professional opinion as a board-certified psychiatrist, licensed in the State of Iowa, the Defendant appeared to have an inadequate understanding of his rights to silence and legal counsel before and during police questioning. His appreciation of rights was substantially impaired.
> Based upon my admittedly abbreviated evaluation, it is my opinion to a reasonable degree of certainty that because of intellectual and cultural limitations, the Defendant's abilities to meaningfully understand his *Miranda* rights and appreciate the consequences of waiving them were compromised when he was interrogated by the police officer on [August 31,] 2016 and more than two years later he is (apparently) none the wiser.

The district court held a hearing, received testimony, viewed the recording of Mousa's interview, and denied the motion:

Contrary to the evidence offered by [Mousa], [his] ability to understand and communicate in English and to understand the *Miranda* warnings and rights were demonstrated for over one hour in the interview session. Clearly, [Mousa] had a complete ability to speak, understand, and to communicate in the English language. The court observed no pressuring by Officer DeMoss which overborne the will of [Mousa] to either speak to the officer and/or to waive his rights per *Miranda* and to engage in the interview. In fact, it appeared [he] was eager to speak as Officer DeMoss asked few questions during the entire one hour plus interview. The credibility of Dr. Fialkov's forensic psychiatry evaluation is highly suspect. From the description Dr. Fialkov gave of [Mousa] during the evaluation, it is not unreasonable to surmise that [Mousa] was either being evasive or engaged in a tactic or tactics to convince Dr. Fialkov that he could not understand English at all.

. . . .

Based upon what the court observed in the DVD interview with Officer DeMoss and also the testimony of [a legal assistant with the county attorney's office who spoke to Mousa], the court finds that the findings of Dr. Fialkov are completely unsupportable. [Mousa] even demonstrated his awareness of his *Miranda* rights when he indicated that he would not provide a buccal swab without first speaking with his attorney.

Accordingly, the motion to suppress is hereby denied except for those portions that occurred during the interview after [Mousa] wished to talk to an attorney.

At trial, Lacey testified she and C.K. were "pretty drunk" when they left that bar in the cab. Over the defense's hearsay objection, Lacey testified C.K. called her in the afternoon and was "hysterical," crying, and speaking fast. C.K. told Lacey she thought she had been sexually assaulted, she was in pain and was headed to the hospital. Lacey also testified C.K. had undergone a medical procedure involving her uterus just months before, and when asked if C.K. was actively looking for sexual partners when they went out, she responded, "No, not at all."

C.K. testified she and Lacey were intoxicated when they left the bar on August 24 and the bartender called them a cab. She stated she had no memory

of any event between the time she was dropped off by the cab driver and was standing by her fence unable to find her keys and the time she woke up on a couch in Mousa's basement.  C.K. testified she "blacked out" and, when she came to, she was still intoxicated.  She did not know how her phone number would be on Mousa's phone. When she got her phone back, she ignored a text message and calls from Mousa's number because she did not recognize the number, and she reported the calls to the police.  She testified she had her uterus removed four or five months prior to the assault and had not engaged in any sexual activity.  C.K. stated she did not have the ability to say no to Mousa or resist him, and the sex act that occurred was against her will.  On cross-examination C.K. stated she had blacked out due to intoxication before.

The jury viewed Mousa's interview with Detective DeMoss.

Mousa testified, stating he saw C.K. getting dropped off near his house and she "came straight to me" and up on his porch.  Mousa stated, "She was drunk, but she was not falling over drunk."  She asked him if he had a phone because she needed to find her phone.  C.K. put her phone number into his phone and tried to call her own phone "multiple times."  Mousa stated C.K. asked him for a beer but he didn't give her one.  Then, while the two of them were sitting on his porch, C.K. started "touching me and touched my cock," "gave me a blow job," "pulled down her skirt and sat on my penis."  Mousa stated the sex was not forced.  He said that after he ejaculated, C.K. tried to walk into his house but he stopped her.  She then "got mad," screaming, shouting, and pacing in front of the house.  That is when Mousa called the police.

The jury found Mousa guilty and he now appeals, contending there is insufficient evidence that sex with C.K. was by force or against her will. Mousa also argues the court erred in allowing Lacey to testify about C.K.'s call to her, improperly instructed the jury, and denied Mousa's motion to suppress statements made during a custodial interrogation. He stated he called C.K.'s number three times the following day to offer to give her a ride to her car.

## II. Scope and Standards of Review.

We review challenges to the sufficiency of the evidence for correction of legal errors. *State v. Jones*, 967 N.W.2d 336, 339 (Iowa 2021). "We review evidentiary rulings on hearsay for errors at law." *State v. Skahill*, 966 N.W.2d 1, 8 (Iowa 2021). The voluntariness of Mousa's statements to law enforcement implicates constitutional issues, so review is de novo. *State v. Ortiz*, 766 N.W.2d 244, 249 (2009).

## III. Discussion.

*Sufficiency of the evidence.* Under Iowa Code section 709.4(1)(a), "[a] person commits sexual abuse in the third degree when the person performs a sex act" if "[t]he act is done by force or against the will of the other person." Mousa asserts there is insufficient evidence his sex act with C.K. was by force or against her will. He notes "the fact that she had been drinking does not mean that the sex act was against her will or by force. There was no evidence that she protested, resisted, or was in fear." While he acknowledges C.K.'s testimony that she could not recall what happened, he argues "the surrounding facts and circumstances demonstrate that C.K. was walking around and able to converse during this period of time."

We view the evidence in the light most favorable to upholding the verdict, accepting any legitimate inferences and presumptions. *State v. Shanahan*, 712 N.W.2d 121, 134 (Iowa 2006). We will uphold a verdict if substantial evidence supports it. *Id.* Evidence is substantial if it would convince a rational fact finder that the defendant is guilty beyond reasonable doubt. *Id.*

"Against the will of the other person" means without the victim's consent. *State v. Meyers*, 799 N.W.2d 132, 142–46 (Iowa 2011) (noting "consent remains the lynchpin of the crime, and the legislature has sought over the years to identify more specific circumstances of nonconsent while leaving the broader 'against the will' standard in place to capture all circumstances of actual nonconsent" and "section 709.4(1) does not require evidence of both force and lack of consent, but one or the other"). As the finders of fact, we recognize the jury is free to credit or reject certain evidence. *State v. Sanford*, 814 N.W.2d 611, 615 (Iowa 2012). "[W]e do not resolve conflicts in the evidence, pass upon the credibility of witnesses, or weigh the evidence." *State v. Hutchison*, 721 N.W.2d 776, 780 (Iowa 2006).

Mousa contends the sex act was consensual—"she started the whole thing." His description of his encounter with C.K. at trial was very different from the description he gave to Detective DeMoss.

C.K. testified she was blacked out and had no ability to consent to sex. On cross-examination, C.K. was asked:

> Q. But to be very clear, based on your testimony, you blacked out right when you got to your gate; correct? A. Yes.
> Q. You came to on that couch; correct? A. Yes.
> Q. Between those two periods of time, you have no recollection of what happened? A. Correct.

Q. So to be fair, you can't really testify to what exactly happened between those two periods of time? A. To be fair, I would say that I sure don't remember that, so I couldn't have given consent.

Q. But we're not quite sure what caused that blackout; correct? . . . A. I already stated to you, sir, that I have blacked out before because of alcohol. And the bruise on my head appeared over a day after I went and saw the nurse, so I'm pretty sure that I blacked out. I've experienced it before. I know the symptoms.

Nurse Morris described the bruising and other injuries she observed during her examination of C.K. When asked a hypothetical question, she testified a person who has blacked out cannot give consent.

Mousa testified C.K. was drunk. Whether C.K. was so intoxicated that she could not apprise her own conduct or she was unconscious, the jury could determine C.K. could not give meaningful consent to a sex act with Mousa—a stranger she encountered when she got out of the cab. There is substantial evidence to support the jury's finding that the sex act was committed against C.K.'s will.

*Excited utterance exception.* The trial court allowed Lacey to testify about C.K.'s statements made on the phone call on the afternoon of August 25 under the excited utterance exception to the hearsay rule. As our supreme court has recently explained:

> An excited utterance is "[a] statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused." Iowa R. Evid. 5.803(2). The statement must be made under the excitement of the incident and not on reflection or deliberation. *State v. Mateer*, 383 N.W.2d 533, 535 (Iowa 1986). The rationale for the exception is that when a declarant makes a statement under the stress of the excitement, the declarant is less likely to fabricate than if the statement was made under reflection or deliberation. *State v. Tejeda*, 677 N.W.2d 744, 753 (Iowa 2004).

*State v. Dessinger*, 958 N.W.2d 590, 601 (Iowa 2021).

We employ a five-factor test to determine whether a statement qualifies as an excited utterance:

> (1) the time lapse between the event and the statement, (2) the extent to which questioning elicited the statements that otherwise would not have been volunteered, (3) the age and condition of the declarant, (4) the characteristics of the event being described, and (5) the subject matter of the statement.

*Id.* (citation omitted). "While time-lapse is important, statements made hours and even days after the event have been admissible." *Id.* (citing *Mateer*, 383 N.W.2d at 535 (one hour); *State v. Galvan*, 297 N.W.2d 344, 346 (Iowa 1980) (two days); *State v. Stevens*, 289 N.W.2d 592, 596 (Iowa 1980) (one hour); *State v. Stafford*, 23 N.W.2d 832, 835–36 (Iowa 1946) (fourteen hours)).

We find no error in the court admitting testimony concerning C.K.'s "hysterical" call made hours after C.K. awoke not knowing where she was or how she got there, believing she had been sexually assaulted.

*Jury instruction and ineffective assistance of counsel.* Mousa seeks to overturn his conviction, arguing a jury instruction requested by defense counsel was improper, the court erred in giving it, and his trial counsel were ineffective in seeking it. Because defense counsel requested the instruction, there is no error preserved for our review. *See State v. Beckwith*, 53 N.W.2d 867, 869 (Iowa 1952) ("Defendant cannot now predicate error upon the court's doing the very thing they requested the court to do.").

Anticipating we would find any error concerning the instruction waived, Mousa asserts trial counsel were ineffective. We do not address the claim because, pursuant to Iowa Code section 814.7, "Iowa courts are 'without the authority to decide ineffective-assistance-of-counsel claims on direct appeal.'"

*State v. Jackson-Douglass*, \_\_\_\_ N.W.2d \_\_\_, \_\_\_, 2022 WL 332824, at *4 (Iowa 2022); *State v. Treptow*, 960 N.W.2d 98, 103 (Iowa 2021); *State v. Tucker*, 959 N.W.2d 140, 154 (Iowa 2021).

In the alternative, Mousa asks that we recognize plain error. We are bound by precedent to deny his request. *See Treptow*, 960 N.W.2d at 109 ("We have repeatedly rejected plain error review and will not adopt it now.").

*Miranda waiver.* Mousa maintains the court erred in finding his waiver of *Miranda* rights was knowing and voluntary.

> In order to execute a valid waiver of one's *Miranda* rights, the waiver must be made "knowingly, intelligently, and voluntarily." "'[V]oluntariness' for . . . due process purposes and *Miranda* purposes are identical." Therefore, "a *Miranda* waiver is involuntary only when it is shown to be the product of police misconduct or overreaching." "For a waiver to be made voluntarily, the relinquishment of the right must have been voluntary, meaning it was the product of the suspect's free and deliberate choice rather than intimidation, coercion, or deception." The question of whether a suspect voluntarily waived his or her *Miranda* rights "is to be made by inquiring into the totality of the circumstances surrounding the interrogation, to ascertain whether the suspect in fact 'decided to forgo his rights to remain silent and to have the assistance of counsel.'"

*State v. Tyler*, 867 N.W.2d 136, 174–75 (Iowa 2015) (alterations in original) (citations omitted).

On our de novo review, the video of Mousa's interview supports a finding that Mousa understands and converses in English, was able to understand the *Miranda* warnings, and that he waived them voluntarily. The court properly denied the motion to suppress.

**IV. Conclusion.**

Finding sufficient evidence supports the conviction for third-degree sexual abuse and no error in admitting hearsay as an excited utterance, and determining Mousa's *Miranda* waiver was knowing and voluntarily entered, we affirm the conviction.

**AFFIRMED.**