# IN THE COURT OF APPEALS OF IOWA

No. 24-0004
Filed February 19, 2025

**STATE OF IOWA,**
    Plaintiff-Appellee,

**vs.**

**BRET MATTHEW MEYER,**
    Defendant-Appellant.
_____

Appeal from the Iowa District Court for Woodbury County, James N. Daane, Judge.

The defendant challenges both the sufficiency of the evidence supporting his convictions and the district court's denial of his motion for mistrial based on alleged prosecutorial misconduct. **AFFIRMED.**

R. Ben Stone of Parrish Kruidenier LLP, Des Moines, for appellant.

Brenna Bird, Attorney General, and Katherine Wenman, Assistant Attorney General, for appellee.

Considered by Greer, P.J., Langholz, J., and Carr, S.J.*

*Senior judge assigned by order pursuant to Iowa Code section 602.9206 (2025).

**GREER, Presiding Judge.**

A jury found Bret Meyer guilty of first-degree burglary, willful injury causing bodily injury, and going armed with intent. On appeal, Meyer challenges the district court's denial of his motion for mistrial based on alleged prosecutorial misconduct during closing arguments. He also contends there is insufficient evidence to support his convictions, arguing there was not substantial evidence he was the person who invaded his ex-girlfriend's home and stabbed her new boyfriend. After our review, we find Meyer's prosecutorial misconduct challenge fails as he could not prove prosecutorial misconduct and there was sufficient evidence to support the charges against him.

**I. Background Facts and Proceedings.**

Starting at 9:01 p.m. on July 18, 2021, Alisha Saunders received four calls on her cell phone, with each displaying "No caller ID" during the call. Alisha answered the first call and heard only breathing on the line. At 9:08 p.m., a second call came through, and the same thing happened. Then, at 9:11 p.m., the third call occurred—this time, Alisha's boyfriend, Chase Cleveland, answered her phone. During the third call, which Chase answered on speakerphone, Alisha heard humming from the other end. The caller otherwise did not speak. Once the call ended, Alisha told Chase that she recognized the humming noise as one Meyer, her former boyfriend, would make when he was nervous. The fourth call came in at 9:22 p.m.; again, the caller did not speak.

Chase and Alisha went to bed in Alisha's room at approximately 11:00 p.m. Within a few minutes, they heard two loud bangs and then glass shattering. With the lights still off, Chase got up and looked out from the bedroom doorway. He

saw a masked intruder, who beelined directly from the living-room entry point to Alisha's bedroom. The intruder, who was armed with a wooden baseball bat, yelled, "You motherfucker," and used the bat to hit Chase in the jaw. Then Chase grabbed the intruder by the torso and pinned him against the wall. While pinned, the intruder pulled a knife from his pants pocket and stabbed Chase once in the chest and once in the side near his armpit. At that point, it became hard for Chase to breathe, and he released the intruder. As he went to the floor, Chase located the bat the intruder had dropped. The two struggled over it before the intruder pulled the bat away from Chase and fled the home.

During the scuffle between Chase and the intruder, Alisha was in the same bedroom and on the phone with 911. Her call went through at 11:04 p.m.; she described that someone was in the home and that they stabbed Chase. While not providing a name to the 911 dispatcher, at one point, Alisha stated, "I know exactly who it is." Police officers arrived about eight minutes into Alisha's 911 call—at approximately 11:12 p.m. The intruder had already fled the home and surrounding property. Almost immediately, Alisha told the officers that Meyer was the intruder; she recognized his voice when he yelled at Chase. Alisha also described the intruder as wearing a grey Nebraska sweatshirt, which she told officers matched one she bought Meyer for Christmas.

As of July 18, Meyer was living with his parents in rural Nebraska about forty-three miles from Alisha's residence in Sergeant Bluff, Iowa. Iowa law enforcement asked Nebraska officials to help with the investigation; two were waiting near Meyer's residence in Nebraska when he pulled into the driveway at 12:24 a.m. on July 19. Meyer was wearing a t-shirt and shorts—not the sweatshirt

and pants the intruder was described as wearing. He denied being in Sergeant Bluff, stating he was driving around local country roads drinking beer after golfing until approximately 9:00 p.m. Meyer allowed the officers to search his truck; they did not find a bat, knife, blood, or clothing matching what the intruder was wearing. Meyer also allowed the officers to look over his arms and legs; he did not have any injuries—from scuffling with Chase, entering Alisha's home through a broken window, or otherwise. Meyer confirmed he had his cell phone with him all night but denied making any calls to Alisha. He showed the officers his cell phone's call log, which did not list any calls as being made.

As a part of the investigation, law enforcement later obtained cell phone records from Meyer's service provider. Those records showed that Meyer's cell phone either made or received calls[1] at 9:01, 9:08, 9:11, and 9:22 p.m. on July 18—the same four times as Alisha received calls. At trial, Meyer denied making the four phone calls to Alisha, testifying, "No, I did not, because I can't talk to her because my phone was blocked after we broke up in June. So I can't make phone calls to her or receive any." While Meyer generally challenged the reliability of the data in the cell phone records, he admitted that a fifth call that was listed—one at 12:15 a.m. on July 19—was accurate; his father called him shortly before he returned home.

At trial, the State introduced a visualization of tower data received from Meyer's cell phone service provider. Contrary to his assertion he was not in Sergeant Bluff on July 18, Meyer's cell phone traveled from the area of Pender,

---

[1] The data from the service provider did not distinguish between made and received calls.

Nebraska to Sergeant Bluff, Iowa and then back to Pender, Nebraska. Between 10:40 and 11:19 p.m., Meyer's phone pinged only the Sergeant Bluff cell tower. The criminal intelligence analyst who mapped the tower data testified that, based on the approximate distance of Meyer's phone from the tower—as measured by the time it took the signal from the antenna to reach the phone and back—Meyer's phone could have been at Alisha's residence between 10:58 and 11:06 p.m. on July 18.

During closing argument, the prosecutor emphasized that the only contested issue before the jury was whether Meyer was the person who invaded Alisha's home and harmed Chase—nobody disputed that someone broke in and stabbed Chase multiple times, causing a collapsed lung and other injuries. Then the prosecutor highlighted that the records for Meyer's phone matched Meyer's testimony about where he was until about 9:30 p.m. on July 18, suggesting the records were therefore reliable to establish that Meyer was in Sergeant Bluff at the time of the home invasion. Next, the prosecutor stated:

> He said Alisha blocked his phone number from calling him, and during his testimony he said he couldn't call Alisha because she had blocked his phone. Well, that's just plain ignorant, and [Meyer] would know that. When Alisha blocked [his] phone number from her phone, it's not some sort of a force field that prevents somebody from calling her. To get around the block, all that would need to happen is [Meyer] would need to change the setting in his phone to hide the number that he's calling from so that Alisha's phone wouldn't recognize the number that he's calling from, and then it would show up as no caller ID, or he could simply dial star 67 and that would block his number so that his call would show an unknown or private number, but allow his call to go through.

The defense attorney asked to approach, and an off-the-record discussion took place before the prosecutor continued with the State's closing statement.

Before the defense began its closing argument, Meyer moved for a mistrial outside the presence of the jury. He argued:

> Your Honor, there was no evidence presented in this case that to block a cell phone you can do star 67 or some other type of way to block a cell phone. That was first introduced in the closing argument by the State here.
>
> It's highly prejudicial to [Meyer]. [The prosecutor] basically has given the jury information that some of these juror members may not know. We have some older people on the jury here who may not even use their cell phone very much. I don't even know how to block, because I've never had to block anybody on my cell phone, but now all of a sudden they know that there's something else out there.
>
> And there was absolutely no evidence presented. [The prosecutor] could have done that through the cell phone person. He could have done it through one of the police officers that were present, but now we have a way to contradict a blocked number because he told them that way. Highly prejudicial to [Meyer]. I would move for a mistrial in this, Your Honor.

The State resisted the motion for mistrial, arguing the ability to get around a blocked number was "something that would be in the knowledge of the jurors" and that it was a fair inference that Meyer was aware of how to do so because the evidence suggested he made the four phone calls to Alisha from his phone even though his number was, in fact, blocked.

The court denied Meyer's motion, stating:

> As the court indicated to counsel in the off-the-record discussion, I believe that the use of cell phones is so ubiquitous, that the knowledge of the vast majority of cell phone users would include the knowledge of how to block a phone and what is the result when a phone is blocked.
>
> I particularly believe that's true for people under age 50. I would challenge you to find someone under age 50 who wouldn't know exactly how that works. There are going to be twelve jurors in there. I am very comfortable with them having that discussion and being able to decide whether or not [the prosecutor's] argument was legitimate or illegitimate.
>
> The cell phone gentleman testified as to the source of that information [showing Meyer made or received calls at the same time Alisha received the four calls in question]. I just think that there's

more than enough evidence for a juror to conclude from the testimony that was offered that that's how that was accomplished.

[Defense counsel], you are free to argue that that evidence [of how to bypass a blocked number] is not in the record and that the jury shouldn't make that conclusion because it wasn't explicitly explained to them by any witness, but I would regard this akin to testimony about a car accident and the jury knowing that there's a trunk button or that there's an accelerator pedal or that there are different types of gear shifts. I mean, the information is so ubiquitous in society today that I don't believe that there's anybody that's going to be confused or tricked into making a factual conclusion based on the evidence that they have.

The jury found Meyer guilty as charged on all three counts.

Meyer moved for new trial in a post-trial motion, re-asserting his claim that the prosecutor's introduction of "new evidence that a 'blocked phone call' could be 'unblocked' by pressing '*67' or other methods" constituted prosecutorial misconduct that denied him a fair trial. He maintained the statements "were misconduct that sought to boost the State's case through unnecessary and over inflammatory means that go outside the record." In a written ruling, the district court again rejected Meyer's argument, concluding the information was common knowledge among cell phone users and that all twelve jurors had cell phones that they deposited with the court attendant prior to deliberations. Alternatively, the court concluded that even if the prosecutor engaged in misconduct in making the statement without evidentiary support in the record, Meyer did not suffer prejudice such that a new trial was warranted.

Meyer was sentenced to a combined term of incarceration not to exceed thirty-five years. He appeals.

## II. Discussion.

### A. Sufficiency of the Evidence.[2]

Meyer challenges the sufficiency of the evidence supporting the jury's determination he was the person who broke into Alisha's home and then struck and stabbed Chase. We review "challenges to the sufficiency of the evidence for the correction of legal error." *State v. Banes*, 910 N.W.2d 634, 637 (Iowa Ct. App. 2018). We affirm when the verdict is supported by substantial evidence. *Id.* "Evidence is substantial when the quantum and quality of evidence is sufficient to 'convince a rational fact finder that the defendant is guilty beyond a reasonable doubt.'" *Id.* (citation omitted). In conducting our review, we do not resolve conflicts in the evidence, decide the credibility of witnesses, or weigh the evidence—those decisions are for the factfinder. *See State v. Musser*, 721 N.W.2d 758, 761 (Iowa 2006). Instead, we consider the evidence in the light most favorable to the verdict, "including all reasonable inferences that may be fairly drawn from the evidence." *Banes*, 910 N.W.2d at 637.

On appeal, Meyer focuses on evidence the State did not have—his DNA was not found at the scene, and he showed no sign of injuries when officers spoke to him at his home an hour after the home invasion. He also argues that the inconsistencies between Alisha's and Chase's initial descriptions of the intruder to

---

[2] We take Meyer's claims in a different order than he presented them. We address the claim of insufficient evidence first because, if successful, Meyer would be entitled to a remand for entry of acquittal, making the question of whether he should receive a new trial moot. *See State v. Trane*, 934 N.W.2d 447, 455 (Iowa 2019) ("If the trial record would not support a conviction on a given count, [the defendant] is entitled to an acquittal on that count, and further proceedings on that count must come to an end.").

law enforcement and their descriptions offered at trial causes them to lack credibility. But when reviewing for sufficiency of the evidence, we broadly and liberally construe the findings of the factfinder in support of the verdict. *State v. Price*, 365 N.W.2d 632, 633 (Iowa Ct. App. 1985); *see also State v. Mangler*, No. 19-0469, 2020 WL 6484038, at *3–4 (Iowa Ct. App. Nov. 4, 2020) (concluding the evidence was sufficient despite the defendant's allegations of "eight . . . shortcomings in the State's case"). Here, Alisha, who dated and lived with Meyer for several months, testified she recognized Meyer by his voice when he shouted at Chase during the home invasion. *See, e.g.*, *State v. Key*, No. 02-1301, 2003 WL 22805357, at *6 (Iowa Ct. App. Nov. 26, 2003) (concluding a witness's identification of the defendant as the perpetrator was substantial evidence of identity). Plus, the cell phone records placed Meyer's phone in the Sergeant Bluff area during the time of the home invasion, in contradiction to Meyer's repeated claims that he was driving around Nebraska country roads at that time. *See State v. Jones*, 967 N.W.2d 336, 343 (Iowa 2021) (recognizing the jury is not required to accept the defendant's version of events). And while Meyer questions the reliability of Alisha's identification and the data from the cell phone service provider, it was up to the jury to decide what evidence to credit, which we do not review in a sufficiency-of-the-evidence challenge. *See Musser*, 721 N.W.2d at 761.

Substantial evidence supports Meyer's convictions.

**B. Motion for Mistrial.**

Next, Meyer challenges the district court's denial of his motion for mistrial based on alleged prosecutorial misconduct. *See State v. Coleman*, 907 N.W.2d

124, 138 (Iowa 2018) ("In order to establish a due process claim based on prosecutorial misconduct, [the defendant] must demonstrate both that prosecutorial misconduct occurred and that the prosecutorial misconduct resulted in prejudice that denied the defendant a fair trial."). He argues that the prosecutor's closing argument that Meyer could have bypassed Alisha's block of his number was not supported by the evidence and deprived him of a fair trial. "Trial courts have broad discretion in ruling on claims of prosecutorial misconduct and we review such rulings for an abuse of discretion." *State v. Plain*, 898 N.W.2d 801, 810 (Iowa 2017) (citation omitted). "When assessing a district court's decision for abuse of discretion, we only reverse if the district court's decision rested on grounds or reasoning that were clearly untenable or clearly unreasonable." *Id.* at 811.

"[T]o establish a violation of the right to a fair trial, [Meyer] must show both (1) error or misconduct and (2) prejudice." *Id.* at 818. Here, because he alleges prosecutorial *misconduct*, Meyer is held to his burden to prove just that: "he must show the prosecutor acted with reckless disregard of [their duty] or intentionally made statements in violation of an obvious obligation, legal standard, or applicable rule that went beyond an exercise of poor judgment." *Coleman*, 907 N.W.2d at 139 (warning against conflating claims of prosecutorial error, which "is based on human error or the exercise of poor judgment," with claims of prosecutorial misconduct). And if he establishes prosecutorial misconduct, Meyer must then establish that "such misconduct resulted in prejudice that denied him a fair trial." *Id.* at 140.

Because Meyer cannot even establish misconduct by the prosecutor, his due process claim necessarily fails. We recognize that there was no evidence introduced at trial regarding whether or how an individual could bypass their phone number being blocked. *See State v. Leedom,* 938 N.W.2d 177, 194 (Iowa 2020) (noting that counsel cannot "misstate or create the record" in closing arguments). But Meyer does not contend the prosecutor's statements were incorrect or false—it was undisputed that a person could, in fact, bypass their phone being blocked. His complaint stems from his belief that the jurors were unlikely to have that information without the prosecutor's statement. From our vantage point, it would seem likely that most jurors understand that a caller can get around a blocked call. And the district court concluded that at least some of the jurors would have had the knowledge based on their own use of cell phones and general understanding. We agree—the district court's analogy comparing this information and a jury's knowledge about an accelerator pedal in a car-accident case was apt. "We do not ask juries to leave their experiences and common sense behind when deliberating." *City of Cedar Rapids v. Bd. of Trs. of the Mun. Fire & Police Ret. Sys.*, 572 N.W.2d 919, 926 (Iowa 1998); *accord State v. Manning*, 224 N.W.2d 232, 236 (Iowa 1974) ("Matters of common knowledge and experience may be used by jurors in arriving at their verdict and in drawing inferences and reaching conclusions from the evidence." (citation omitted)).

We do not condone inserting unproven details into closing arguments to get "the win." Logically, the State's expert on the cell phone data, a criminal intelligence analyst, could have offered the information the prosecutor inserted. Thus, the best practice would have been to introduce evidence about how an

individual could get around their phone number being blocked before making the inference during closing argument that Meyer was aware of the ability and also used the technology to do so when he repeatedly called Alisha on July 18. But, contrary to Meyer's assertion, this instance did not "divert[] the jury from deciding the case based on the evidence." *See Coleman*, 907 N.W.2d at 139 (citation omitted). Based on the district court's conclusion that at least some members of the empaneled jury would have already known the information,[3] we also disagree with Meyer's assertion that the prosecutor created evidence with his statement. *See State v. Shanahan*, 712 N.W.2d 121, 139–40 (Iowa 2006) ("The prosecutor cannot . . . assert a personal opinion or create evidence."). Because we conclude Meyer is unable to establish prosecutorial misconduct, we need not consider whether the challenged statement caused him prejudice. We affirm the district court's denial of his motion for mistrial.

**III. Conclusion.**

Substantial evidence supports the jury's determination that Meyer was the person who invaded Alisha's home and stabbed her new boyfriend. And we agree with the district court that Meyer failed to establish a due process violation based on prosecutorial misconduct. We affirm the denial of Meyer's motion for mistrial and his convictions.

**AFFIRMED.**

Langholz, J., concurs; Carr, S.J., concurs specially.

---

[3] We cannot say the district court abused its discretion in reaching this conclusion; it had the best understanding of the empaneled jury members and what information may be commonly known among jurors in its district.

**CARR, Senior Judge** (concurring specially)

I agree substantial evidence supports the verdict, but I part company with the majority's conclusion that the prosecutor committed no misconduct.

In his initial final argument, as quoted above, he explained to the jury how one can evade a block on one's cell phone number and place a call to a number, the holder of which does not want to hear from him. This statement had no support in the evidentiary record. It amounted to misconduct. *State v. Schlitter*, 881 N.W.2d 380, 393 (Iowa 2016) (explaining that prosecutorial misconduct includes "making unsupported statements during closing argument"), *abrogated on other grounds by State v. Crawford*, 972 N.W.2d 189 (Iowa 2022). I agree that the general method for using a cell phone is widely known. *State v. Manning*, 224 N.W.2d 232, 236 (Iowa 1974), cited by the majority, supports that a jury may rely on its common knowledge and experience in its deliberations. In *Manning*, that included the proposition that gasoline and diesel fuel are inflammable. *See* 224 N.W.2d at 236. I do not believe that the method to avoid a cell phone number block is as widely known as the incendiary properties of gasoline. Prosecutorial misconduct "describes conduct by the government that violates a defendant's rights whether or not that conduct was or should have been known by the prosecutor to be improper and whether or not the prosecutor intended to violate the Constitution or any other legal or ethical requirement." *State v. Coleman*, 907 N.W.2d 124, 138–39 (Iowa 2018) (citation omitted). I think that describes the prosecutor's conduct here.

When I turn to consider whether the misconduct was prejudicial, I consider the five factors described in *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003).

The conduct was not pervasive. It did bear directly on the central issue in the case—identity. The state's case was strong, made particularly so by evidence the defendant was carrying his cell phone in Sergeant Bluff, Iowa, at the time of the burglary there, and lied to the Nebraska law enforcement officers about it. No cautionary instruction was requested or given. The defense did not invite the error.

Considering these together and giving most weight to the strength of the state's case, I find insufficient prejudice to warrant reversal. I therefore concur in the result.